Jerry BURNAMAN, Plaintiff,

v.

BAY CITY INDEPENDENT SCHOOL DISTRICT et al., Defendants.

Civ. A. No. 75–G–149.

United States District Court, S. D. Texas, Galveston Division.

Feb. 15, 1978.

Larry W. Watts, Houston, Tex., for plaintiff.

John D. Gilpin, Fulbright & Jaworski, Houston, Tex., for defendants Bay City Independent School Dist., Dorothy Birkner, John Estlinbaum, Robert Kelly, John Robinson and Fred Stanley.

Emerson Banack, Jr., San Antonio, Tex., for defendants John Briggs and Edwin Roberson.

## MEMORANDUM OPINION

COWAN, District Judge.

### Background Facts

In September 1963, Jerry Burnaman, a graduate of Stephen F. Austin Teacher's College in Nacogdoches, Texas, began teaching vocational education in the Bay City Independent School District (hereinafter "BCISD"). He was well suited by temperament and background for this position. After growing up on a farm in East Texas, he had worked his way through Stephen F. Austin by working night shifts as a welder in a foundry. He had also worked as a mechanic, a farmer, a re-fabricator and re-builder of jeeps. He was a skilled beekeeper, hunter and gunsmith.

All of these skills, his natural aptitude for his profession, his apparent empathy with the youngsters whom he taught and counseled, his interest in and dedication to the community, enabled Burnaman to succeed. He and others, notably James Charlton, established the first Coordinated Vocational Agricultural Education Program (CVAE) in the Bay City area. This CVAE program was highly successful and served both Bay City and surrounding communities. The program, its teachers and counselors consistently received high praise from professional evaluation teams.

Burnaman's wife also taught in BCISD. Mr. and Mrs. Burnaman became active in community affairs, bought a home, began to educate their two children in the Bay City schools, and made friends in the community.

Burnaman was a totally competent, highly dedicated, extremely effective vocational teacher. The facts concerning his skills and dedication in this connection were supported by the testimony of the school superintendent under whom he worked for many years, and the testimony of Fred Mathis, Chairman of the Board of BCISD until April of 1975, and the parents of the children he had taught and counseled.

During the trial of this case defendants made concerted efforts to marshal all of the derogatory information about Jerry Burnaman which could be gathered—but this determined effort never produced any evidence challenging Burnaman's skills, dedication and qualifications as a vocational teacher.

After nine years as a teacher, Burnaman was promoted to the position of vocational counselor—charged with the responsibility of counseling those students in Bay City High School who were taking or contemplating taking vocational courses.

Although defendants produced some evidence that Burnaman's performance as a counselor was not letter perfect, the overwhelmingly persuasive evidence was that as a counselor he performed excellently in his most significant role of inspiring and encouraging the youngsters he advised. The testimony of Mrs. Orsack, whose son was counseled by Burnaman in her presence, was particularly persuasive. Her testimony was supported by that of vocational director Charlton, and the former superintendent of schools, both of whom had supervised Burnaman's work for years.

In July 1974, the Board of Trustees of BCISD (hereinafter "the Board") employed John Briggs as Superintendent of Schools. Dr. Briggs is a well-qualified educator who has served for relatively brief periods with multiple-school districts throughout south and east Texas. Dr. Briggs was and is an exceptionally ambitious, hard-driving individual who had an apparent mandate from the Board to "shake up" the school system and make substantial changes in BCISD's programs and personnel. Dr. Briggs is also an authority on school law; he taught a course on that subject and had some personal experience as a litigant in a "school" case. See *Board of Trustees of Crystal City Independent School District v. Briggs*, 486 S.W.2d 829 (Tex.Civ.App.—Beaumont 1972, writ ref. n. r. e.).

It could be concluded that as part of his campaign to "shake up" the system, Dr. Briggs employed as his high school principal another hard-driving and ambitious young administrator—Edwin Roberson. Like Dr. Briggs, Dr. Roberson had had considerable experience, most of it in many various school districts for brief periods. Dr. Roberson has also worked as a salesman, claims adjuster, and most recently a salesman of stocks and bonds. Dr. Roberson remained with BCISD for seven and one-half months.

Before Briggs' employment, Burnaman for many years had worked under the supervision of James Charlton. Charlton and Burnaman had a good personal relationship and a long history of professional association. Briggs ousted Charlton as vocational director and placed Burnaman under Dr. Roberson's supervision. Previously Burnaman had always received consistently commendable evaluations from his supervisor and had felt happy and secure in his work. On February 28, 1975 Burnaman's status changed abruptly. For the first time in his career, Burnaman received a very unfavorable written evaluation from Roberson. Roberson (who at the time had supervised Burnaman for only three months) stated in his evaluation that he would recommend that Burnaman's one-year contract be "non-renewed."

*"Policies, Regulations and By-Laws" of BCISD*

BCISD had no tenure or "continuing contract" arrangement with its teachers; however, it had published "Policies, Regulations and By-Laws" (hereinafter "Policies") which granted a professional employee in Burnaman's predicament a number of substantive and procedural rights.

Board members in their testimony interpreted the "Policies" and this interpretative testimony was totally consistent with the plain terms of the "Policies." These "Policies" gave professional employees of BCISD at least three relevant rights:

1. The right to have annual evaluations performed on the basis of definite, objective standards described with some precision in Policy No. 4117, entitled "Evaluation."

2. The right to have the administration follow a definite procedure in connection with non-renewal. This procedure required that the professional be advised at the beginning of the school year of the objectives for the year and the criteria by which he would be judged. In the event the employee was noted to have deficiencies during

**930**

the year, he was to be told orally by his supervisor of those specific deficiencies and given an opportunity to improve. If these communications did not correct the situation, the employee was to be given written notice of the specific deficiencies before March 1 (which was a critical date). If the deficiencies were not corrected by these procedures, the employee's contract was to be voted upon at the March meeting so that the employee, if not renewed, could find other employment for the next school year. (See Plaintiff's Exh. 17, page 5.)

3. The right to a hearing before the Board within thirty days after written request for such a hearing. (See Plaintiff's Exh. 1). The evidence here establishes conclusively, and the court finds as a matter of law, that Drs. Briggs and Roberson and the Board refused to follow this "Policy" and effectively denied Jerry Burnaman a hearing until, for all practical purposes, it was too late for the Board to reverse the Roberson-Briggs action, or to conciliate the controversy between Burnaman on the one hand and Roberson-Briggs on the other.

On February 28, 1975, when Jerry Burnaman was given the first unfavorable evaluation he had received, he was also given written notification that his contract would not be renewed and that he would be given consideration for a new position if an opening occurred. (See Plaintiff's Exhs. 6 and 21) A finder of fact could conclude on the basis of very substantial (if not absolutely conclusive) evidence that this February 28, 1975 evaluation was inaccurate, non-factual, not objective, grossly unfair and not prepared in compliance with BCISD's "Policies" relating to evaluations.

There is substantial evidence to support a conclusion that Dr. Roberson, in his evaluation of February 28, 1975, made no effort to apply the objective standards prescribed by the "Policies," did not apply the standards promulgated, and made factual misstatements which he knew, or should have known, to be inaccurate.

The evidence here establishes conclusively, and the court finds as a matter of law, that Drs. Briggs and Roberson and the Board did not follow the duly promulgated "Policies" in Burnaman's case in connection with notification of his deficiencies.

Before February 28, 1975, Jerry Burnaman had been given only the most sketchy and trivial indications of dissatisfaction with his performance, and no hint whatsoever that his alleged shortcomings were so serious that his contract would be "non-renewed." His written evaluation in November of 1974 had been commendable. The programs for which he was responsible had received outstanding evaluations from outside, objective evaluators. Burnaman, insofar as he knew, continued to have the respect and confidence of his superiors—as he had had for many years.

On February 28, 1975, after receipt of Dr. Roberson's evaluation, Burnaman discussed his situation with both Dr. Briggs and Dr. Roberson. He was able to obtain only a very general explanation of his alleged deficiencies. On the 28th Burnaman also discussed his predicament with his personal friend, the Chairman of the School Board, Dr. Fred Mathis. Dr. Mathis was sympathetic with Burnaman's position and agreed to convey to the other Board members his (Mathis') feeling that the evaluation and recommendation were unjust and that Jerry Burnaman wished a hearing before the Board.

The evidence establishes (perhaps not conclusively, but virtually so) that Burnaman's desire for a hearing was communicated to other Board members shortly after February 28. Defendant Dorothy Birkner, one of the Board members, testified that she knew before May 20, 1975 that Burnaman wanted a hearing, and Dr. Mathis testified that he told the Board members shortly after February 28 that Burnaman wished a Board hearing. In the light of hindsight, it is now apparent that on February 28, Jerry Burnaman urgently needed a prompt hearing for several reasons.

*First,* he needed to find another job for the 1975–76 school year if the Board supported the Briggs-Roberson position.

*Second,* and perhaps more important, the political situation was in a state of transition such that time would hurt Burnaman and help Briggs-Roberson. It could be concluded that Burnaman, who was not sophisticated or experienced in school politics, did not perceive this necessity, but that Briggs fully understood and used the passage of time. Time was running for Briggs and against Burnaman for these reasons: Dr. Mathis, a pediatrician, is both an independent-minded, forceful, intelligent man and a friend of Jerry Burnaman. Mathis testified here in a direct, straightforward manner. He is obviously not subservient to Dr. Briggs, Dr. Roberson or anyone else. Dr. Mathis was a "lame duck" Chairman, whose term was to expire in April of 1975. By February 1975 the deadline for filing for re-election had passed, and Dr. Mathis, who had served on the Board for many years, had not filed for re-election. If Jerry Burnaman, after February 28, 1975, had been given a prompt hearing, Dr. Mathis would have presided.

Dr. Mathis' successor as Board Chairman was Dr. Robert Kelly, a dentist. Dr. Kelly's deposition was read by Burnaman's counsel, but he did not appear personally at the trial, even though he is a named defendant. The court and jury were not given full opportunity to evaluate Dr. Kelly's demeanor, character or credibility. No explanation was offered for Dr. Kelly's failure to appear personally or to testify. Defendants were represented by experienced, skilled counsel, and the court must therefore conclude that defendants, through their counsel, were persuaded that Dr. Kelly's demeanor and personal testimony would not be favorable to defendants' cause.

Three trustees did testify: Dorothy Birkner (who had just become a member of the Board in April 1975), John Estlinbaum, and John Robinson. Board member Fred Stanley did not appear or testify, personally or by deposition. From the testimony of the Board members who did appear and from the circumstance of Dr. Kelly's and Mr. Stanley's non-appearance, the court concludes that after Dr. Mathis' retirement from the Board in April 1975, the Board was no longer an independent, vigorous group, but a group virtually subservient to the new superintendent, John Briggs, and his new high school principal, Edwin Roberson. Briggs and Roberson, this court finds, foresaw the likelihood of a subservient Board after April 1975, but Burnaman did not perceive this possibility, or if he did, felt powerless.

Despite his oral requests for a hearing on February 28, 1975, Burnaman did not receive a hearing for six months. By that time the opportunity to conciliate the controversy had evaporated.

Jerry Burnaman's oral request for hearing was ignored—although at executive sessions in March (and possibly in February and April) his future was discussed in his absence, and practical decisions were made without giving Burnaman an opportunity to refute Dr. Roberson's evaluation of February 28, 1975.

Eventually it became apparent to Burnaman that his oral request for a hearing would be ignored. By the time Burnaman perceived this reality, however, Briggs and Roberson had had an opportunity to present their ideas concerning Burnaman's limitations to at least one—if not two or three—executive sessions of the Board.

This court concludes and finds that the real decisions with reference to Jerry Burnaman were made by the Board acting behind closed doors at the executive sessions of March and April, and that Jerry Burnaman was deprived of the protection against arbitrary action which a hearing is designed to afford. See language and discussion in *Slochower v. Board of Education,* 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956) and Justice Douglas' dissent in *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, at 584, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

On March 21, 1975, Dr. Roberson, apparently recognizing that he had failed to follow the "Policies," wrote Burnaman a letter

purporting to spell out Burnaman's alleged deficiencies. (See Plaintiff's Exh. 25). This letter was vague, general and patently artificial. The court finds that the reasons stated by Roberson in his letter of March 21 were not the real reasons for his actions, but merely a pretext and transparent effort to justify a decision which the Briggs-Roberson group had already made and persuaded the Board to follow. In this connection, Justice Douglas states in *Roth, supra,* at 408 U.S. 582, 92 S.Ct. at 2712 that:

. . . the search is to ascertain whether the stated ground was the real one or only a pretext.

Roberson's letter of March 21, this court finds, was a pretext.

Finally, on April 17, 1975, Jerry Burnaman wrote to Dr. Briggs with a copy to Board Chairman Kelly, formally requesting a hearing before the Board. As indicated above, the Board's own "Policies," by their clear terms, and by the testimony of the trustees, gave Burnaman an *absolute right* to a hearing within thirty days. Five more months elapsed before he was given a hearing.

On April 18, 1975 Dr. Briggs answered Burnaman's letter of April 17, denying a hearing because Burnaman had not made a written request for such a hearing within fifteen days after February 28, 1975. Despite the voluminous "Policies" of BCISD, there was not one written word in the "Policies" which supported Briggs' contention that Burnaman was required to demand a hearing in writing within fifteen days after February 28, 1975.

Briggs, to support the position which he had forcefully asserted in his letter of April 18, 1975, purports to rely upon a document appearing in this record as Defendants' Exh. 13 and entitled "Procedures on: Hearings and Appeals." Exhibit 13 (admitted into evidence for the limited purpose of showing Briggs' good faith) was never properly authenticated or established, by competent evidence, to be a duly promulgated regulation of the State Board of Education which was in force on April 18, 1975. More important, however, is the fact that BCISD had never adopted Defendants' Exh. 13 in any manner. BCISD's duly promulgated "Policies" were totally inconsistent with the highly restrictive and demanding procedures promulgated in Defendants' Exh. 13. Neither Burnaman nor the Board of BCISD, insofar as this record reveals, had ever even heard of Defendants' Exh. 13 before April 18—much less agreed to be bound by its highly legalistic requirements. There is no evidence that Briggs sought legal advice in connection with the preparation of his letter of April 18, and the inference is permissible that he simply relied upon his own perception of himself as an expert on "school law."

An applicable statute of the State of Texas is V.T.C.A. Education Code § 23.26 which provides:

(d) The trustees may adopt such rules, regulations, and by-laws as they may deem proper.

Pursuant to that statutory authority, BCISD on April 18 had duly promulgated and published "Policies" which gave Jerry Burnaman an *absolute right* to present his case to the Board within thirty days after April 18.

The evidence here establishes conclusively, and the court finds as a matter of law, that Drs. Briggs and Roberson and the Board did not follow the duly promulgated "Policies" in Jerry Burnaman's case in connection with his demand for a hearing within thirty days after April 18, 1975.

On May 16, 1975, having been afforded no hearing before the Board, Burnaman wrote Briggs the following note:

Dear Dr. Briggs:

You indicated to me that you would make your recommendation to the board concerning my contract on May 20. If this is true, am I permitted to be at the meeting?

Jerry Burnaman

Responding by telephone to Burnaman's note of May 16, Briggs in effect said: "No," stating that it was not customary for employees whose fate was being determined to appear at "executive" sessions of the Board.

On May 20, 1975—acting entirely on the basis of the Briggs-Roberson recommendation and Trustee Birkner's private investigation (during which she interviewed unidentified persons, unknown to both the Board and Jerry Burnaman)—the Board voted to offer Burnaman a teaching, rather than a vocational counseling position—effectively demoting him from his position as a counselor.

Burnaman did not accept the teaching contract because he had never been afforded the hearing to which he was entitled and because he probably harbored a vain hope that the Board, when presented with his side of the matter, would assert its independence of the Briggs-Roberson dominance and allow him to continue his work as a counselor.

A fact-finder could also conclude that it was totally unreasonable of Briggs-Roberson and the Board to expect Burnaman to make a final decision concerning the acceptance of a teaching contract before he had had an opportunity to present his case to the Board, in accordance with the Board's duly published "Policies."

Shortly after May 20, Burnaman employed Larry Watts, his present counsel. During the period after May 20, 1975, there were numerous efforts to schedule a hearing. All of the delay in granting a hearing after May 20, 1975 was not the fault of the Board or of Drs. Briggs and Roberson; however, it is undisputed in the evidence, and the court finds that it is established conclusively, that there was no reason why the Board could not have granted Burnaman a hearing within thirty days after his written request of April 17, 1977 or immediately after his oral request of February 28, 1975. In this connection, John Estlinbaum, one of the defendants, testified definitely and without equivocation that there was no reason why the Board could not have granted Burnaman a hearing within thirty days after April 17, 1975. There is no evidence to the contrary.

After the Board had voted to extend Burnaman a teaching contract rather than a counseling contract, the position of the parties had hardened, and conciliation had become more difficult. By May 20, a situation had already been created in which Burnaman's vocational counseling position could have been restored only with some "loss of face"; however, on June 13 and 14, 1975, a series of events occurred which was calculated to fix Burnaman's predicament more solidly.

On June 13 and 14, 1975, the Board conducted hearings for four teachers allegedly aggrieved by the Briggs-Roberson "shake-up." One of these was Dr. James White.

This court judicially notices the pendency of Civil Action No. 75–G–175, styled *James White v. Bay City Independent School District.* Dr. White's case is a Title VII case alleging that he, and a class which he represents, are the victims of racial discrimination by BCISD and that his, White's, discharge was the result of racial discrimination. Dr. White, like Burnaman, is represented by vigorous and effective counsel. Dr. White had been an employee of BCISD for over twenty years. Before the latter 1960's, Dr. White had been principal of the black high school. When the black and white high schools were merged in the late 1960's, Dr. White became the assistant principal. The issue in the White hearing was whether or not Dr. White was discharged because of incompetency, as alleged by Briggs-Roberson, or as the result of racial discrimination.

Jerry Burnaman testified as a witness for Dr. White in the hearing before the Board on June 13. Almost immediately, Dr. Briggs wrote Burnaman the following letter (see Plaintiff's Exh. 42):

> You stated under oath on June 14, 1975, that you were unemployed at that time even though you had been issued the contract with the Bay City Independent School District. Therefore, we are placed in somewhat of a quandry concerning this position and whether or not effort should be made to seek another person to serve in this capacity.

> I would like to request that one (1) copy of the contract issued to you be signed and returned to this office on or before

4:00 P.M. on July 11, 1975. Should the contract not be returned by that time, my recommendation to the Board of Education for the Bay City Independent School District will be that this contract be declared null and void and that the position be filled by another person.

A finder of fact could conclude that Dr. Brigg's letter, which shows obvious irritation with Burnaman's testimony, was written in retaliation for Burnaman's action in supporting Dr. White's position.

While it is undoubtedly true that there was some necessity for moving on with the business of making a decision concerning the identity of the vocational teachers for the coming 1975–76 school year, there is a complete absence of evidence that the teaching position, which was tendered to Burnaman on May 20, was such a key position that an immediate decision was necessary.

On July 11, 1975, Watts, Burnaman's lawyer, sent the following telegram to Briggs (see Plaintiff's Exh. 45):

> Reference to your letter, please take notice that the contract is the issue of the Board hearing. We feel that this is an undue and unwarranted pressure that is being applied to Mr. Burnaman. Further letter is following regarding board hearing but I·am available on Saturday or in the evening. Simply notify of time when I might meet with the board on this matter.

Briggs received this telegram on July 14. Nevertheless, on July 15 the Board met and in response to Briggs' recommendation, voted to withdraw the teaching contract previously tendered Jerry Burnaman. At this point, Burnaman had been effectively terminated—still without an opportunity to present his side of this controversy to the Board.

A fact finder could easily conclude that even if there were a real necessity for making a decision by July 15 concerning whether Jerry Burnaman would accept the teaching position, Dr. Briggs and the Board, in mid- or latter June, could simply have scheduled Burnaman's hearing on July 15 and given him and his counsel irrevocable notice to be present.

On August 22, 1975, a hearing with reference to Jerry Burnaman's case commenced. Counsel for Burnaman and the Board initiated the hearing by a dispute concerning certain documentary evidence. The hearing was recessed and reset for September 24, 1975, when after a hearing which lasted into the early morning hours, the Board predictably voted to confirm the previous decision made with reference to Jerry Burnaman's situation.

By September it was too late for Burnaman to obtain a teaching position. Despite efforts to do so, Burnaman was unable to obtain a teaching position in any school district immediately adjacent to Bay City. He was unemployed during the 1975–76 school year and in September of 1976 commenced work for the Livingston Independent School District as a vocational teacher, where he was later promoted to vocational counselor.

By September 30, 1975, Jerry Burnaman had reason to be vividly aware of the truth of Justice Douglas' observation in *Roth, supra,* that:

> Non-renewal of a teacher's contract is tantamount, in effect to a dismissal and the consequences may be enormous. Non-renewal can be a blemish that turns into a permanent scar.

### Jury Findings Summarized

The issues submitted to the jury represented an effort by this court to enunciate for the jury the principles established and discussed in *Mt. Healthy City School District v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). The jury findings may be itemized as follows:

1. The Board's actions with reference to Burnaman's employment during the period from February 28, 1975 until September 1975 were taken in retaliation for Burnaman's exercise of his First Amendment rights.

2. Burnaman's exercise of his First Amendment rights was a substantial

and motivating factor in the Board's decisions concerning Burnaman's employment.

3. The Board would not have taken the actions which it took if Burnaman had refrained from exercising his First Amendment rights.

4. Burnaman and the Board had a contractual relationship which obligated the Board to comply with its own "Policies" with reference to reassignment or termination of Burnaman.

5. The Board failed to afford Burnaman due process of law in connection with his employment relationship.

6. Burnaman, before September 1, 1975, had a good professional reputation.

7. The Board's action with reference to Burnaman's employment did affect, and was calculated to affect adversely, his good professional reputation.

8. The Board's failure to follow its own "Policies" was a substantial factor in the termination of Burnaman's employment relationship with BCISD.

9. Drs. Briggs and Roberson acted, in connection with Burnaman's employment, with malice, ill will, and an intentional purpose of depriving Burnaman of his constitutional rights.

10. A fair and reasonable sum to compensate Burnaman for the mental anguish accompanying the termination of his employment relationship was $17,000.00.

11. Burnaman's lost wages resulting from the termination of his employment relationship with BCISD were $16,440.00.

12. The sum of $25,000 in exemplary damages should be assessed against Briggs and Roberson.

*Authorities*

The clear starting place in any legal analysis of a problem of this nature is *Board of*

*Regents of State Colleges v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 and *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (both decided June 9, 1972).

Roth, like Jerry Burnaman, worked under a one-year contract with no tenure; there the similarity between Roth and Burnaman ends. The rules promulgated by the Wisconsin State University provided no protection for a non-tenured teacher who was not employed for a succeeding year. The non-tenured teacher, under the duly promulgated rules, had no right of review of appeal and was not entitled to be given any reason for non-retention. Burnaman, on the contrary, had the right to rely upon "Policies" which gave him substantial rights and an absolute right of appeal, and a hearing before the school board.

However, Roth was found to possess a valid claim if he could establish that he was discharged because of the exercise of his right of free speech. Burnaman has sustained his burden of proof in this regard and thus is clearly entitled to recovery under the rules applied in *Roth.*

The significant and applicable language from Justice Stewart's majority opinion in *Roth* is:

> . . . when protected interests are implicated, the right to some kind of *prior hearing* is *paramount* . . . 'Liberty' and 'property' are broad and majestic terms. They are among the great constitutional concepts . . . purposely left to gather meaning from experience . . . they relate to the whole domain of social and economic fact, and the statesmen who founded this Nation knew too well that only a stagnant society remains unchanged. *National Insurance Company v. Tidewater Company,* 337 U.S. 582, 646, 69 S.Ct. 1173, 93 L.Ed. 1556 (Frankfurter, J., dissenting) . . .
>
> . . .
>
> The state, in declining to rehire the respondent, did not make any charge against him that might seriously damage his standing and associations in the community. It did not base the non-renewal

of his contract on a charge, for example, that he had been guilty of dishonesty or immorality. Had it done so, this would be a different case. For 'where a person's good name, *reputation,* honor, or integrity is at stake because of what the government is doing to him, notice and opportunity to be heard are essential' . . . in such a case, due process would accord an opportunity to refute the charge before University officials. In the present case, however, there is no suggestion whatever that the respondent's 'good name, reputation, honor or integrity' is at stake.

. . .

Certain attributes of 'property' interests protected by procedural due process emerge from these decisions. To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, a reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims. 408 U.S. at 571–578, 92 S.Ct. at 2705.

The procedural posture of *Roth* is also significant in determining its applicability to the case at bar. Roth had been granted a summary judgment by the district court which had been affirmed by the court of appeals. While seven members of the Court felt that the trial court's summary disposition was improper, Justices Brennan and Douglas argued eloquently that the trial court's summary judgment for Roth should have been sustained.

The effect of the Supreme Court's reversal was to send Roth's case back to the trial court for a determination as to whether Roth's First Amendment rights had been denied.

Burnaman here has obtained jury findings, supported by overwhelming evidence, that this First Amendment rights were denied. In addition, this court, after a full hearing, finds that certain material portions of Burnaman's case are established as a matter of law.

■ Justice Douglas accurately stated in his *Roth* dissent, 408 U.S. at 582, 92 S.Ct. at 2712, that:

. . . In the case of teachers whose contracts are not renewed, tenure is not the critical issue . . .

Burnaman did not have tenure or any reasonable expectation of "tenure"; however, he had a reasonable expectation that the Board would comply substantially with its own duly promulgated "Policies." The defendant Board totally failed to honor Burnaman's reasonable expectation.

Failure of the Government to follow its own duly promulgated rules and published policies violates a citizen's right to procedural due process. See: *Vitarelli v. Seaton,* 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); *Service v. Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); *Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954); *Hammond v. Lenfest,* 398 F.2d 705 (2nd Cir. 1968); *Hollingworth v. Balcom,* 441 F.2d 419 (6th Cir. 1971); *United States v. Heffner,* 420 F.2d 809 (4th Cir. 1970); *Ferguson v. Thomas,* 430 F.2d 852 (5th Cir. 1970); *Assaf v. University of Texas System,* 399 F.Supp. 1245 (S.D.Tex. 1975); *Berends v. Butz,* 357 F.Supp. 143 (D.C.Minn.1973); *Zimmerer v. Spencer,* 485 F.2d 176 (5th Cir. 1973); *Mabey v. Reagan,* 537 F.2d 1036 (9th Cir. 1976).

The case at bar is a vivid illustration of the accuracy of Justice Douglas' observation in *Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123 at 179, 71 S.Ct. 624 at 652, 95 L.Ed. 817 (concurring opinion):

. . . It is procedure that spells out much of the difference between rule by law and rule by whim or caprice. Steadfast adherence to strict procedural safeguards is our main assurance that there will be equal justice under law.

The Supreme Court has noted in *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), that there is sometimes a conflict between a claim for First Amendment protection and the need for orderly administration of a school system. In the current case, there was no such conflict. There was no reason why a hearing could not have been afforded within thirty days after April 17, 1975, the date of Burnaman's written request. This court finds that if the Board had followed its own procedures, and a hearing had been granted within thirty days after April 17, there is a strong probability that Burnaman's employment with BCISD in some capacity would have continued, that some means of preserving and avoiding damage to Burnaman's professional reputation would have been found, and that this lawsuit would not have been prosecuted. In fact, the refusal of Briggs, Roberson and the Board to comply with the duly promulgated "Policies" predictably disrupted the orderly administration of the school system, and exposed BCISD to readily foreseeable liability.

■ Even if the failure of Briggs, Roberson and Dr. Robert Kelly to follow the duly promulgated "Policies" of BCISD arose from mere innocent ignorance, or misunderstanding, such innocent ignorance or misunderstanding would afford no defense to a cause of action for actual damages. In this connection, see Justice White's language in *Wood v. Strickland,* 420 U.S. 308 at 321, 95 S.Ct. 992, at 1000, 43 L.Ed.2d 214, where he stated:

> . . . The official himself must be acting sincerely and with a belief that he is doing right, but an act violating a student's constitutional rights can be no more justified by ignorance or disregard of settled, indisputable law on the part of one entrusted with the supervision of students' daily lives, than by the presence of actual malice. . . .

■ This court finds, as a matter of law, that Drs. Roberson and Briggs, and Chairman of the School Board, Dr. Kelly, reasonably should have known that their action in denying Burnaman a hearing in response to his letter of April 17, would and did violate Burnaman's constitutional rights. *Wood v. Strickland, supra,* established that in this area of the law, ignorance is no defense. It is also established that Dr. Kelly, Dr. Roberson and Dr. Briggs, in connection with all of their actions or failure to act with reference to Burnaman, functioned in the scope of their employment or duties for BCISD. Actual and exemplary damages as found by the jury should be assessed therefore against both Dr. Briggs, Dr. Roberson and against BCISD.

The assessment of exemplary damages against BCISD as well as against Roberson and Briggs is based upon the undisputed evidence that various school Board members participated actively in virtually all of the activities upon which the verdict against Briggs and Roberson was based, and upon the further evidence which justifies an inference that, as a matter of law, the school Board, with full knowledge of the facts, ratified the actions of Briggs and Roberson. In addition, the court holds, as a matter of law, that everything which Roberson and Briggs did was within the scope and course of their employment. The imposition of exemplary damages upon the Board is supported, in the court's view, by the following authorities:

*Houston Transit Company v. Felder,* 146 Tex. 428, 208 S.W.2d 880 (1948). The Supreme Court of Texas there stated the applicable rule as follows:

> . . . In practically all jurisdictions the law is now settled that a master is liable for the willful and malicious acts of his servant when done within the scope of his employment. Such acts are imputable to the master, under the doctrine of respondeat superior, and in accordance with the general principles that the master is liable for any act of the servant done within the scope of his employment, as well as for any act of the servant which, if isolated, would not be imputable to the master, but which is so connected with and immediately grows out of another act of the servant imputable to the master, that both acts are treated as being one

indivisible tort, which, for the purposes of the master's liability, takes its color and quality from the earlier act.

See also: *Commonwealth of Massachusetts v. Davis,* 140 Tex. 398, 168 S.W.2d 216 (1942); *King v. McGuff,* 149 Tex. 432, 234 S.W.2d 403 (1950).

*Attorneys Fees*

█ Plaintiff, in his complaint, seeks both legal and equitable relief. He also prays for reasonable attorneys fees. Following the verdict in this cause, this court held a hearing at which testimony was introduced concerning the hours consumed in the prosecution of this case by counsel for plaintiff. On the basis of this testimony, as well as on the basis of this court's observation of the conduct of counsel during the trial of the case and this court's analysis of the other factors to be considered in assessing attorneys fees, the court awarded plaintiff substantial attorneys fees. In connection with this award of attorneys fees, the court makes the following findings of fact, pursuant to this court's obligation to try those portions of the case relating to the prayer for equitable relief.

1. Defendants Roberson and Briggs, acting in their capacity as responsible employees of BCISD, performed the actions made the basis of this suit with bad faith, oppressively, and with unreasonable and obdurate obstinancy, in the following respects:

   a. In the making of an evaluation on February 28, 1975, containing false and inaccurate information, which defendants Roberson and Briggs knew, or should have known, was false and inaccurate;

   b. In refusing to grant Burnaman a hearing promptly after his oral and written requests;

   c. In withdrawing Burnaman's tendered teaching contract before he had been given an opportunity for a hearing and at a time when there was no compelling necessity for making an immediate decision concerning the withdrawal of his tendered teaching contract; and

   d. In failing to re-offer Burnaman a teaching position after the August and September hearings.

2. BCISD ratified and affirmed the unreasonable and obdurate obstinancy of Briggs and Roberson and actively participated in this unreasonable and obdurate obstinancy, and acted as a group with bad faith and oppressiveness.

3. BCISD, Briggs and Roberson, all acted in bad faith in connection with the defense of this cause in asserting that the hearings in August and September afforded due process when Briggs, Roberson and BCISD all knew and were well aware that the actual decisions with reference to Burnaman had been made at ex parte, secret hearings held during the spring of the year, at a time when Burnaman was being denied his rights to a hearing.

4. The prosecution of this case by Burnaman and his counsel has aided in the effectuation of an important public policy, i. e., the enforcement of the obligation of this school district to avoid arbitrary and unconstitutional action.

5. The prosecution of this case by Burnaman and his counsel has conferred benefits upon all school employees, teachers and administrators, because the successful prosecution of cases such as this has a strong tendency to vindicate the rights of all school district employees to the exercise of their rights of free speech.

6. An award of attorneys fees in this case, in addition to the damages found by the jury, makes it less likely that teachers and other employees of school districts and other governmental entities will be arbitrarily deprived of their First and Fourteenth Amendment rights.

7. An award of attorneys fees in this case makes it more likely that in the future teachers and other school district employees who may have been

deprived of their First and Fourteenth Amendment rights will be able to obtain redress for this violation of their rights.

8. The bringing of this action should have been unnecessary and was compelled by the unreasonable, obdurate obstinancy of Roberson, Briggs and BCISD.

The findings of fact set forth above which this court makes pursuant to its obligation to make findings relating to the claims for equitable relief, are supported by and consistent with the findings of the jury assessing exemplary damages.

In view of the findings set forth above, this court is of the opinion that the applicable authorities support the award of substantial attorneys fees.

Justice White in *Alyeska Pipeline Service v. Wilderness Society*, 421 U.S. 240 at 258, 95 S.Ct. 1612 at 1622, 44 L.Ed.2d 141 at 154 (1975) said:

> . . . A court may assess attorneys fees . . . when the losing party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons . . .' *F. D. Rich Co. v. Industrial Lumber*, 417 U.S. 116 at 129, 94 S.Ct. 2157, 40 L.Ed.2d 703 (citing *Vaughan v. Atkinson*, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1972); cf. *Universal Oil Products Co. v. Root Refining Co.*, 328 U.S. 575, 580, 66 S.Ct. 1176, 90 L.Ed. 1447 (1946). These exceptions are unquestionably assertions of inherent power in the courts to allow attorneys fees in particular situations . . . .

The award of attorneys fees in this case is supported by the following court of appeals and district court authority: *Burt v. Board of Trustees*, 521 F.2d 1201 (4th Cir. 1975); *Oppenheimer Mendez v. Acevedo*, 512 F.2d 1373 at 1375 (1st Cir. 1975); *McEnteggart v. Cataldo*, 451 F.2d 1109 (1st Cir. 1971); *Fairley v. Patterson*, 493 F.2d 598 (5th Cir. 1974) (See collection of applicable cases at 493 F.2d at 606); *Donahue v. Staunton*, 471 F.2d 475 (7th Cir. 1972); *Zimmerer v. Spencer*, 485 F.2d 176 (5th Cir. 1973) (award of attorney fees affirmed in a teacher-discharge case); *Stolberg v. Member of Board of Trustees of State Colleges of Connecticut*, 474 F.2d 485 (2nd Cir. 1973) (Court of appeals held it error for trial court to deny attorneys fees where award of the attorneys fees would assure that the teachers forced to vindicate clear constitutional claims were not deterred by the prospect of costly and protracted legal proceedings.)

This case is analogous to those school desegregation cases in which trial courts have determined that attorneys fees were incurred unnecessarily because the bringing of an action was unnecessary and was compelled by the school board's unreasonable and obdurate obstinancy. See *Monroe v. Board of Commissioners of City of Jackson, Tenn.*, 453 F.2d 259 (6th Cir. 1972); *Bradley v. School Board of Richmond, Va.*, 345 F.2d 310 (4th Cir. 1965).

In the court's opinion, this case is clearly distinguishable from cases like *Hander v. San Jacinto Junior College*, 519 F.2d 273 (5th Cir. 1975) and *Roane v. Callisburg Ind. Sch. Dist.*, 511 F.2d 633 (5th Cir. 1975). In neither *Hander* nor *Roane* was the trial court presented with a factual pattern showing bad faith or unreasonable obstinancy or obdurate behavior on behalf of the defendants.

### Jurisdiction

The jurisdiction of this court is based on the First and Fourteenth Amendments to the Constitution of the United States, 42 U.S.C. § 1983, which is applicable to defendants Briggs and Roberson, and upon 28 U.S.C. § 1331, the general federal question statute.

Justice Rehnquist in *Mt. Healthy City Ind. Sch. Dist. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) has expressly left open the question of whether or not a school district was a "person" within the meaning of 42 U.S.C. § 1983. Circuit court opinions which are binding upon this court indicate that Bay City Independent School District is not a "person." See *Ingraham v. Wright*, 525 F.2d 909 (5th Cir. 1976); *Monell v. Dept. of Social Services of City of*

*New York,* 532 F.2d 259 (2nd Cir. 1976); and *Amen v. City of Dearborn,* 532 F.2d 554 (6th Cir. 1976).

Since this court clearly has jurisdiction, however, under 28 U.S.C. § 1331, and since the award of attorneys fees is supported by the findings of this court (confirmed by the jury findings) that defendants Roberson, Briggs and BCISD acted unreasonably and with obdurate obstinancy and bad faith, a detail exploration of the question of whether or not BCISD is a "person" would appear to be unnecessary.