HOWARD S. et al., Plaintiffs,

v.

**FRIENDSWOOD INDEPENDENT SCHOOL DISTRICT et al., Defendants.**

Civ. A. No. G–78–92.

United States District Court,
S. D. Texas,
Galveston Division.

June 23, 1978.

J. Patrick Wiseman and Reed Martin, Houston, Tex., for plaintiffs.

Richard G. Sedgeley and James S. Kelly, Houston, Tex., for FISD defendants.

Douglas B. Owen, Austin, Tex., for State defendants.

James C. Todd, Austin, Tex., for amicus curiae.

## STATEMENT OF REASONS FOR PRELIMINARY INJUNCTION

COWAN, Judge.

Pursuant to the mandate of Rule 65(d), Fed.R.Civ.Proc., this Court states herein its reasons for the preliminary injunction issued on June 21, 1978.

These findings of fact and conclusions of law are made solely for the purpose of determining the plaintiffs' rights to obtain preliminary injunctive relief pursuant to Rule 65, Fed.R.Civ.Proc. These findings of fact and conclusions of law are not findings upon the merits. The merits are reserved for trial at a later date, if necessary.

Douglas S. (hereinafter "Douglas"), the minor plaintiff in this case, is an Anglo-American male born in the State of Califor-

nia on November 16, 1961. In 1962, he was hospitalized and tested for meningitis. Although his mother was eventually able to furnish him a stable family background, the first three years of his life were unsettled, chaotic and traumatic. Competent medical evidence establishes that these two events created a situation in which Douglas has minimal brain damage, a definite learning disability, and at least temporarily, a severe emotional disturbance. Medical testimony establishes that these events in his early childhood are probably the most significant, although not the most immediate, causes of the difficulties which have precipitated this litigation.

Douglas went through the first five years of his schooling in California, where he was diagnosed as having minimal brain damage, and placed in special education classes.

Douglas' parents moved to Friendswood in 1973, and Douglas was enrolled in the public schools maintained by defendant FISD (Friendswood Independent School District). During his first year of school in FISD, his teachers noted his short attention span, hyperactivity and demands for attention. In May of 1974, while enrolled at the Friendswood Junior High School, he was evaluated for the FISD by competent, independent, outside consultants, who noted that despite his normal intelligence, he had made markedly slow progress in school and that probable organic brain damage as well as anxiety interfered with his ability to concentrate, remember and perceive accurately. The consultants recommended that Douglas " . . . continue in a resource program in which he can receive special help with basic subjects . . ." and that "efforts should be made by the school counselor to establish a warm relationship with Douglas . . ."

During his junior high years, Douglas was placed in a special education program in which he was, for the most part "mainstreamed," i. e., placed in classes with non-handicapped children, but still nevertheless, given special help by a "resource teacher."

In November of 1974, Mrs. Patricia Burton worked out a program for Douglas in-volving special help, and this program apparently produced reasonably good results during his junior high years.

In mid-August of 1976, Douglas was enrolled in the Friendswood High School. Although FISD's program with reference to Douglas had been reasonably successful in dealing with his problems during junior high, this success ended abruptly when Douglas entered high school. He immediately began to develop behavior problems, characterized by truancy and wandering in the halls. The Assistant Principal, Mr. Fred Nelson, regarded these difficulties as discipline problems and not special education problems and failed to notify the special education department of Douglas' difficulties in adjusting to high school.

These difficulties in high school were clearly foreseeable. All of the experts who have testified have agreed that a young man with Douglas' handicaps, when confronted with the challenge of adjusting to a high school environment and coping with the strains of puberty, is likely to develop severe difficulties. FISD had coped with Douglas' difficulties fairly well up until August of 1976, but FISD did not cope adequately with Douglas' difficulties from August 1976 until December of that year.

Douglas' difficulties at school were paralleled by difficulties in adjusting at home. In November 1976, he was referred to Dr. Grace Jamison at the John Sealy Hospital in Galveston. Dr. Jamison, a child psychiatrist, began to treat Douglas. In December 1976, just before or during the Christmas holidays, Douglas made a suicide attempt which resulted in his being confined in the Graves Unit at John Sealy Hospital for several weeks.

After Douglas was released from the Graves Unit, Dr. Jamison recommended his placement in the Oakes Unit of the Brown School, a private school in Austin. Both Dr. Jamison and Dr. Boynton from the Brown School have testified credibly that Douglas, at the present time, is not able to return to FISD in a normal classroom setting, but that he is capable of receiving an education, and that if he is allowed to remain in a

setting like the Brown School another 12 to 24 months, he has a reasonable chance of developing into a reasonably well-adjusted person who can lead a productive life. If removed from the Brown School or some similar facility, his prognosis is, the doctors agree, very poor.

The undersigned has concluded that since August of 1976, when Douglas entered high school, FISD has failed to provide him a free, appropriate public education and that this failure was a contributing and a proximate cause (although certainly not the sole or even the predominant cause) of Douglas' severe emotional difficulties which culminated in his suicide attempt and confinement in the Graves Unit of John Sealy Hospital in December of 1976.

Although it is a harsh conclusion, the undersigned must reluctantly conclude that following the development of Douglas' difficulties in adjusting to high school, FISD engaged in a calculated, deliberate effort to avoid and evade its legal responsibility. FISD's activities in this regard violate its legal obligations under the Rehabilitation Act of 1973 (29 U.S.C. § 794) and the Fifth and Fourteenth Amendments to the Constitution of the United States.

The most important deficiencies, in connection with FISD's conduct occurred during the period from August of 1976 until December 1976 and from January 1977 until July 6, 1977. During that period Douglas had been classified as a minimal brain damaged child who needed and was entitled to receive special education. Despite this, when he developed disciplinary difficulties and was wandering the halls, the special education department was never notified. Dr. Wren, the head of special education, was never told that Douglas was having difficulties; instead, Douglas' difficulties were handled entirely and solely as disciplinary problems. No effort was made to determine whether or not his disciplinary problems were related to his diagnosed handicaps. This pattern continued despite expressions of interest and concern by Howard S. and Judy S. (Douglas' parents) to the school administration.

On January 18, 1977, while Douglas was in the Graves Unit of the John Sealy Hospital in Galveston, FISD, without notice to Douglas or his parents, "officially dropped" Douglas from FISD. This effective and constructive expulsion occurred without notice to the parents, without a hearing of any kind, and is a clear violation of the FISD's obligation under the Constitution of the United States. See *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1974).

On February 15, 1977, Mrs. S. met with FISD's superintendent, the assistant principal of the high school, and the head of special education; informed these officials of Douglas' difficulties; delivered to them a handwritten letter indicating that Douglas was only temporarily out of school; advised that Mrs. S. was seeking a suitable educational program for him in the light of his handicaps; and advised that she wished to participate in a scheduled ARD (Admissions, Review and Dismissal) meeting to determine if a suitable program could be developed for Douglas in FISD.

Three days later, on February 18, 1977, the ARD meeting occurred. Mrs. S. was not given an opportunity to be present. The ARD committee "dismissed" Douglas from the special education program "following the usual procedure of Friendswood ISD regarding students who move . . ." This conduct was a subterfuge. Douglas and his family had not moved. Douglas had been placed in a hospital. The hospital had referred him to a special school because of his handicaps and his severe emotional disturbance. By no stretch of the imagination can it be contended that he had "moved." FISD here clearly violated the duties placed upon it by the Constitution of the United States. See *Goss v. Lopez, supra.*

Ultimately in May 1977, Mr. and Mrs. S. obtained counsel and requested an impartial due process hearing. Mr. and Mrs. S. were entitled to this due process hearing under the provisions of both the United States Constitution and the Rehabilitation Act of 1973 (29 U.S.C. § 794). Continuing its previous pattern, however, FISD intentionally

evaded and avoided its responsibility to provide an impartial due process hearing.

A gathering which can best be described as a meeting occurred on July 6, 1977. This "meeting" cannot accurately be described as a hearing. The meeting was chaired by FISD's retained counsel. The designated decision maker was the school superintendent. There was no formal introduction of evidence, no formal presentation of arguments, no notice of the issues to be decided at the meeting, no impartial due process hearing examiner, no findings of fact or conclusions of law, and no real decision of any kind rendered at or after the meeting.

It is true that in July 1977 the Education for All Handicapped Children Act of 1975 (20 U.S.C. § 1401 et seq.) had not become fully operative, and the regulations pursuant to that statute had not been published; the plan of the State of Texas for compliance with that Act had not been approved; however, FISD was still obligated to comply with the Rehabilitation Act of 1973 (29 U.S.C. § 794) and with the Constitution of the United States.

The Rehabilitation Act of 1973 (Public Law 93–112 codified at 29 U.S.C. § 794) provides in its pertinent parts as follows:

No otherwise qualified handicapped individual in the United States, as defined in § 706(6) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

FISD at all material times has received federal financial assistance.

On May 4, 1977, the Secretary of Health, Education and Welfare, had published in 45 C.F.R. § 84.36 the regulations issued pursuant to the Rehabilitation Act of 1973. This regulation states:

§ 84.36 Procedural safeguards.

A recipient that operates a public elementary or secondary education program shall establish and implement, with respect to actions regarding the identification, evaluation, or educational placement of persons who, because of handicap, need or are believed to need special instruction or regulated services, a system of procedural safeguards that includes notice, an opportunity for the parents or guardian of the person to examine relevant records, an impartial hearing with opportunity for participation by the person's parents or guardian and representation by counsel, and a review procedure. Compliance with the procedural safeguards of section 615 of the Education of the Handicapped Act is one means of meeting this requirement.

Section 615 of the Education of the Handicapped Act (Public Law 94–142 codified at 20 U.S.C. § 1415) sets forth detailed provisions concerning procedural safeguards and clearly provides that: " . . . no hearing conducted pursuant to the requirements of this paragraph shall be conducted by an employee of such agency or unit involved in the education or care of the child . . . "

This meeting of July 6, 1977, did not meet the requirements of the regulations published under the Rehabilitation of the Handicapped Act of 1973 (specifically 42 C.F.R. § 84.36) and was not consistent with the procedures promulgated in § 615 of Public Law 94–142 (codified in 20 U.S.C. § 1415, passed on November 29, 1975). In addition, the meeting (if it is claimed to have been a hearing) was not consistent with the due process clause of the Fourteenth Amendment to the Constitution of the United States. See *Lau v. Nichols,* 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1973); *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1974); *Morrisey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); *Mathews v. Eldridge,* 424 U.S. 319 (see particularly the analysis at 335), 96 S.Ct. 893, 47 L.Ed.2d 18; *Sullivan v. Houston ISD,* 307 F.Supp. 1328, 333 F.Supp. 1149 (1969–71). While factually distinguishable, the analysis of Chief Justice Burger in *Hortonville JSD No. 1 v. Hortonville Education Assn.,* 426 U.S. 482, 96 S.Ct. 2308, 49 L.Ed.2d 1 (1976) supports the conclusion that, even without reference to the recent Congressional enactments, the meeting of

July 6, 1977 (if argued to be a hearing) did not meet the requirements of substantive and procedural due process.

After they had employed counsel, Mr. and Mrs. S. took virtually all action which could conceivably have been taken to attempt to obtain administrative relief. Numerous letters were written to the Texas Educational Agency (hereinafter "TEA") to no avail. Similar entreaties were made to the Department of Health, Education and Welfare (HEW), which launched or said that it launched an investigation in July 1977. Apparently, from the record here, nothing has been heard further from this investigation in the eleven intervening months.

Arguably, an "appeal" could have been taken from the meeting of July 6, 1977 to the FISD Board of Trustees; however, there was no decision to appeal from. In addition, this Court finds from the pleadings and arguments asserted in this cause that an appeal from the "meeting of July 6, 1977" to the Board of Trustees of FISD would have been a futile gesture. The Board's retained counsel was fully cognizant of and an active participant in the meeting of July 6, 1977. The school superintendent and the director of special education (who was also one of the principal administrators in the school system) participated actively in events after January of 1977. It is clear, and the Court finds, that the Board of Trustees ratified the actions of the school administrators at the time of and after Douglas' constructive expulsion in January of 1977 and the further actions relating to Douglas up to July 6, 1977.

A hearing before the Board of Trustees would not have satisfied the requirements of 29 U.S.C. § 794 and the regulations promulgated pursuant thereto. Specifically, 45 C.F.R. § 84.36 would not have been satisfied, and the procedures promulgated by the Education for All Handicapped Children Act of 1975 (Public Law 94–142 § 615 codified at 20 U.S.C. § 1415) would not have been met.

This Court has concluded that the Board of Trustees of FISD has received extremely poor advice concerning its legal obligations and the possible liability of individual administrators and Trustees for intentional violation of plaintiffs' constitutional rights. In this connection, the attention of the Board of Trustees is respectfully directed to the possibility of personal liability being imposed upon school board members for failure to comply with their legal obligations. See Justice White's language in *Wood v. Strickland,* 420 U.S. 308 at 321, 95 S.Ct. 992 at 1000, 43 L.Ed.2d 214, where he stated:

. . . The official, himself, must be acting sincerely and with a belief that he is doing right, but an act violating a student's constitutional rights can be no more justified by ignorance or disregard of settled, indisputable law on the part of one entrusted with the supervision of students' daily lives, than by the presence of actual malice . . .

See also *Burnaman v. Bay City Independent School District,* 445 F.Supp. 927 (S.D. Tex.1978).

In July 1977 there *may* have been some justification for lack of information concerning the Trustee's legal obligations. There is no like justification now.

The foregoing constitutes the Court's general findings of fact and conclusions of law applicable to this case. In addition the Court makes the following specific findings of fact and conclusions of law:

1.

Plaintiffs have taken all reasonable and practicable steps to exhaust administrative remedies in this cause.

2.

The procedures employed by FISD in connection with the constructive expulsion of Douglas and the other procedures relating to Douglas from January 1977 until the present date have denied Douglas and his parents substantive and procedural due process in violation of the guarantees of the Fifth and Fourteenth Amendments to the Constitution of the United States.

**3.**

Mr. and Mrs. S were caught in a typical governmental "Catch 22" situation. FISD purported to have expelled Douglas because he "moved from the system." Thereafter, FISD refused to give him an impartial due process hearing, and took the position that nothing further could be done with the child until he was re-enrolled in FISD. It was impossible to re-enroll him because he had been placed, because of his severe emotional difficulties, in a school outside the jurisdiction of FISD. This removal of Douglas to the Brown School occurred because of FISD's refusal to comply with its legal obligations and its refusal to attempt to work out an appropriate educational plan to afford Douglas a free, appropriate public education.

**4.**

At the pertinent times, no adequate mechanisms have existed to afford the plaintiffs a full administrative hearing, or a meaningful administrative remedy. In this connection, see plaintiffs' exhibits 7, 8, 15, 16, 18 and 23 (particularly TEA's letter of November 30, 1977 to Mr. Reed Martin).

**5.**

The undersigned, in determining whether or not to grant a preliminary injunction, has balanced the interests of the parties. The Court concludes that the consequences of denying relief to Douglas and his parents could be disastrous, and that the denial of relief could destroy Douglas' chances to lead a normal life. On the contrary, the relief granted against FISD merely creates, for FISD, an expense and inconvenience— moreover this expense and inconvenience is an expense and inconvenience which is imposed upon FISD by law and which FISD has a legal obligation to undertake. In addition, the Trustees' failure to meet their legal obligations promptly could well result in substantial personal liability.

**6.**

Douglas at all material times has been a "handicapped child" as that term is defined in the Education for All Handicapped Children Act of 1975 (Public Law 94–142 codified at '20 U.S.C. § 1401 et seq.) Since December 1976, Douglas has been seriously emotionally disturbed and that serious emotional disturbance is compounded by a specific learning disability.

**7.**

At all material times Douglas has been a "handicapped" child, as that term is defined in § 4(a) of Public Law 94–142 [20 U.S.C. § 1401(1)] because he has been seriously emotionally disturbed and handicapped by a specific learning disability.

**8.**

At all material times Douglas has been a child with specific learning disabilities, as that term is used in the Education for All Handicapped Children Act of 1975 (Public Law 94–142 codified at 20 U.S.C. § 1401, et seq.) in that he has suffered from minimal brain dysfunction and probable organic brain damage.

**9.**

At all material times Douglas has been a "qualified handicapped individual" as that term is used in the Rehabilitation Act of 1973 (Public Law 93–112 codified at 29 U.S.C. § 794) and since August of 1976, he has in fact been excluded from participation in and denied the benefits of, and subjected to discrimination under a program or activity receiving federal financial assistance, i. e., the operation of FISD.

**10.**

Since August of 1976, FISD has failed to afford Douglas a free, appropriate public education and has thus discriminated against him.

**11.**

FISD has failed to provide, since August of 1976, an individualized education program for Douglas which meets his unique needs. This failure commenced in August of 1976 and continues to this date.

**12.**

At all material times, Douglas has been a "handicapped child" as that term is defined in 45 C.F.R. § 128.5 in that he has since December of 1976, suffered from a severe, emotional disturbance, compounded by a specific learning disability.

**13.**

For some periods of time since June of 1977, Douglas has suffered from a handicap which made placement in a public or private residential program necessary in order for him to have the benefit of a free, appropriate public education. The Court does not hold that such placement will be necessary in the indefinite future, and this determination (it is hoped) will be made by the administrative process functioning through an impartial due process hearing of the type contemplated by § 615 of Public Law 94–142 (20 U.S.C. § 1415) and the regulations promulgated under the Rehabilitation Act of 1973 (specifically the regulation appearing at 45 C.F.R. § 84.36).

**14.**

During the period from January 1977 until the present date, the State of Texas has not afforded Douglas and his parents a feasible or practicable administrative remedy because TEA has not established procedures to afford an impartial due process hearing in this type of case, or an appeal or review of the type contemplated by § 615 of the Education for All Handicapped Children Act of 1975 [20 U.S.C. § 1415(c)].

**15.**

There is no legal impediment in the State of Texas to the establishment of the procedural safeguards mandated by the Education for All Handicapped Children Act of 1975 (Public Law 94–142, codified at 20 U.S.C. § 1415). This is true because although there may be legal requirements which require that binding action of certain types be taken only by the Boards of Trustees of school districts, it is common knowledge that the Board of Trustees of Independent School Districts cannot make independent determinations of every question of every conceivable nature presented for decision. For example, employment decisions in reality, are made by the administrators of the Independent School Districts and ratified by the Boards of Trustees. There is no legal impediment to the establishment of an impartial due process hearing procedure such as that set forth in plaintiffs' exhibit 24 (Administrative Procedure Concerning Special Education approved by the Houston Independent School District Board of Education on October 21, 1977).

**16.**

■ The regulations issued by the Secretary of Health, Education and Welfare under the Rehabilitation Act of 1973 (codified at 29 U.S.C. § 794), the Education for All Handicapped Children Act of 1975, and the Amendments of 1974 (codified at 20 U.S.C. § 1401 et seq.) are reasonably related to the purposes of the enabling legislation. See concurring opinion by Mr. Justice Stewart in *Lau v. Nichols*, 414 U.S. 563, at 569, 94 S.Ct. 786, 39 L.Ed.2d 1.

**17.**

Douglas became seriously emotionally disturbed in December of 1976. This emotional upheaval was the precipitating factor which led to his hospitalization and necessitated his enrollment at the Brown School. This emotional disturbance was the result of multiple factors. Medical evidence established that the predominant cause was probably related to organic brain damage and environmental factors in the first three years of his life. On the other hand, the fact that he was not afforded free, appropriate public education during the period from the time he enrolled in high school until December of 1976, was, this Court finds, a contributing and proximate cause of his emotional difficulties and emotional disturbance.

**18.**

■ 42 U.S.C. § 1983 and the Rehabilitation Act of 1973 (29 U.S.C. § 794) do afford the plaintiffs a private cause of action.

*Lau v. Nichols*, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1973).

## CONCLUSION

■ On the basis of the findings of fact and conclusions of law set forth above, the Court has concluded that there is a high probability that plaintiffs will succeed in the trial of this case on the merits. The Court has further concluded that the plaintiffs will suffer irreparable injury if not given preliminary injunctive relief. The Court has also balanced the irreparable harm which the plaintiffs will suffer against the inconvenience to the defendants and has determined that the irreparable and grave nature of the harm which will be suffered by the plaintiffs greatly outweighs the inconvenience and expense which will be imposed upon the defendants by preliminary injunctive relief. The Court has also determined that the public interest will be served by the entering of a preliminary injunction for the reason that such preliminary injunction will afford the plaintiffs their statutory and constitutional rights, and will encourage compliance with the law.

Reference to the legislative history reveals that it was the judgment of the Congress that the apparently substantial expense of compliance with the Education for All Handicapped Children Act of 1975 (Public Law 94–142, 20 U.S.C. § 1401) is actually much less than cost of life-long institutionalization. Senate Report 94–168, U.S.Code Cong. & Admin.News 1975, pp. 1425, 1433 says:

> The long range implications of these statistics are that public agencies and taxpayers will spend billions of dollars over the lifetimes of these individuals to maintain such persons as dependents and in a minimally acceptable lifestyle. With proper education services, many would be able to become productive citizens, contributing to society instead of being forced to remain burdens. Others, through such services, would increase their independence, thus reducing their dependence on society.

The Court finds the foregoing language to be directly, squarely applicable to the facts of this case.

For the reasons stated herein, the Court, after hearing argument of counsel on the form of the injunctive relief, has entered a preliminary injunction in compliance with the terms and provisions of Rule 65, Fed.R. Civ.Proc. (see copy attached as Exhibit A).

## PRELIMINARY INJUNCTION

On the 18th day of May, 1978, the above-entitled and numbered cause was filed seeking a temporary restraining order. Plaintiffs and their counsel appeared in chambers and the Court, after hearing argument, declined to issue a temporary restraining order, but set a hearing for the purpose of determining whether or not a preliminary injunction should issue. This hearing occurred on various dates, culminating in a hearing on June 21, 1978. All parties were allowed to introduce all evidence tendered, present authorities and present full arguments. In compliance with Rule 65(a)(2), Fed.R.Civ.Proc., the Court has considered a consolidation of the extensive hearing with trial on the merits but has declined to do so because to do so might deny the parties their rights to a trial by jury of contested issues of fact. The Court has stated into the record its detailed findings of fact and conclusions of law supporting the granting of this preliminary relief and incorporates such findings of fact and conclusions of law in this preliminary injunction.

*Reasons*

In compliance with Rule 65(d), the Court states, in summary form, the following reasons for the issuance of this injunction:

## EXHIBIT A

1. Plaintiffs have been denied rights guaranteed to them by the Rehabilitation Act of 1973 (Public Law 93–112 § 504, codified at 29 U.S.C. § 794) in that Douglas S., a qualified handicapped individual, has been excluded from participation in and denied the

benefits of a free, appropriate public education in the Friendswood Independent School District (hereinafter FISD), and has been subjected to discrimination under an activity receiving federal financial assistance.

2. Douglas S. has been denied the rights to procedural and substantive due process guaranteed by the Fourteenth Amendment to the Constitution of the United States and has been constructively expelled from FISD without being afforded the procedural and substantive due process required by the Constitution of the United States.

3. Plaintiffs have shown a probability of success on the merits at final trial and that plaintiffs will be irreparably injured if temporary injunctive relief is not granted. The public interest will be served by the granting of a preliminary injunction. The certainty of harm to plaintiffs outweighs the inconvenience and expense to the defendants occasioned by the granting of injunctive relief.

*Relief Granted as to FISD*

**1.**

Defendants FISD, Ted L. Thomas, J. L. Birdwell, Riley Ross, Harold Whitaker, Bill N. Allen, C. W. Cline, William P. Jones, Dickie K. Warren (hereinafter called "FISD defendants") will forthwith cause an immediate and comprehensive evaluation of Douglas S. and determine his special educational needs. This evaluation may be conducted by a competent, independent, professional evaluator retained by the FISD defendants and need not be done in consultation with the Brown School, but must be done in consultation with Douglas S.'s parents and must be done in such manner as to take advantage of the work of the Brown School and to avoid disturbing Douglas S.'s current placement in the Brown School.

**2.**

After such consultation and evaluation, the FISD defendants will immediately develop an individual educational plan which specifies Douglas S.'s needs and all services required to meet those needs.

**3.**

The FISD defendants will thereafter provide directly or arrange to contract for provision of, appropriate educational services for plaintiff Douglas S. without cost, affording contact with non-handicapped children in a normal setting to the maximum extent appropriate.

**4.**

Douglas S. will remain in the Brown School until such new placement is available, and the FISD defendants must pay the cost of the Brown School on behalf of Douglas S. from January 18, 1977, the date of his constructive expulsion without due process, until Douglas S. is afforded a new placement or until appropriate administrative bodies have afforded Douglas S. and his parents the impartial due process hearing and review of such impartial due process hearing required by 29 U.S.C. § 794 and described in detail in 20 U.S.C. § 1416.

**5.**

The FISD defendants shall, while the foregoing steps are in progress, create an impartial due process hearing system so that future complaints about or concerning plaintiff Douglas S.'s educational placement may be processed administratively. The FISD defendants shall, in creating and administering this system, comply with the requirements of 20 U.S.C. § 1415 and the applicable regulations published pursuant to the Rehabilitation Act of 1973 and the Education for All Handicapped Children Act of 1975.

**6.**

The FISD defendants will take all action necessary and appropriate to insure that Douglas S. will not be denied treatment and education in his present educational placement (i. e., the Brown School) until full due process has been afforded Douglas S. and his parents, including payment of the

Brown School charges during the period from January 18, 1977 until the date when due process is fully afforded to Douglas S. and his parents. The FISD defendants' obligation to pay the costs and charges of the Brown School with reference to Douglas S. shall continue until terminated by written agreement of the parties or further order of this Court.

*Relief Granted as to "State Defendants"*

Defendants M. L. Brockette, L. Harlan Ford, Don L. Partridge, and Joe Kelly Butler (hereinafter called "State Defendants") shall, during the period when the FISD defendants are complying with the injunctive relief granted above, insure that the State Defendants are prepared to afford a review of a decision made with reference to Douglas S. by the FISD defendants and in doing so, shall comply with the procedures required by 20 U.S.C. § 1415(c) and all regulations issued applicable thereto.

*Security*

In compliance with Rule 65(c), the Court will require Howard S. and Judy S. to post a security bond in the amount of $500 for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained. In this connection, the Court acknowledges that such security is a mere token and required solely to comply with Rule 65(c), but the Court also acknowledges that the acquisition of a bond of the type which would be required to fully protect the FISD defendants from any loss resulting from this injunction would be virtually impossible and could probably be obtained only by posting cash or negotiable securities equal to the amount of money which the FISD defendants will be required to expend in compliance with this preliminary injunction. The requirement of an excessive or greater bond would in effect deny Howard S. and Douglas S. the statutory and constitutional rights which this Court is attempting here to protect.