STACEY G., By her next friends, WILLIAM AND JANE G., Plaintiffs,

v.

PASADENA INDEPENDENT SCHOOL DISTRICT, Dr. C. Lee Meyer, Harvey Turner, Sam Hawkins, Carl Schwartz, Ruddy Schwartz, John Elam, Lamar Weinbrenner, Dr. B. J. Garner, George Lewis Anderson, Texas Education Agency, Raymon L. Bynum, State Board of Texas, Joe Kelly Butler, Defendants.

Civ. A. No. H–81–1752.

United States District Court,
S. D. Texas,
Houston Division.

Aug. 19, 1982.

---

Sarah A. Scott, Brooklyn, N. Y., for plaintiffs.

Donald G. Henslee, Doyal, Henslee & Hairston, Austin, Tex., and C. Ed Davis, Asst. Atty. Gen., Austin, Tex., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CARL O. BUE, Jr., District Judge.

*Introduction*

On July 9, 1981, plaintiffs Stacey G., a handicapped child, by her next friends, William and Jane G., residents of Pasadena, Harris County, Texas, commenced the instant action against the Pasadena Independent School District (hereinafter P.I.S.D.); Dr. C. Lee Meyer (Superintendent of P.I.S. D.); Sam Hawkins (Vice-President of the Board of Trustees of P.I.S.D.); Carl Schwartz (Secretary of the Board of Trustees of P.I.S.D.); Rudy Schubert (Assistant Secretary of the Board of Trustees of P.I.S. D.); John Elam, Lamar Weinbrenner, and Dr. B. J. Garner (members of the Board of Trustees of P.I.S.D.); George Lewis Anderson (Director of Special Services of P.I.S. D.); Texas Education Agency; Raymon L. Bynum (Commissioner of Education for the State of Texas); State Board of Education of the State of Texas; and Joe Kelly Butler (Chairman of the State Board of Education), seeking declaratory and injunctive relief, as well as damages, to redress alleged violations of rights guaranteed plaintiffs by Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (Supp.1981, the Education for All Handicapped Children Act of 1975, 20 U.S.C. §§ 1400, *et seq.* (1978) (hereinafter Act); 42 U.S.C. § 1983 (1981); The Equal Protection and Due Process Clauses of the 14th Amendment to the United States Constitution; Tex.Educ.Code Ann. § 16.104 (1982); and the Texas Education Agency's Policies and Administrative Procedures. Pertinent to the instant motion, plaintiffs' allege basically that defendants failed to properly evaluate or reevaluate Stacey and provide Stacey with a "free appropriate public education."

Shortly after the commencement of this cause, Judge George E. Cire, United States District Judge for the Southern District of Texas, entered a temporary restraining order at plaintiffs' request which directed:

(1) Defendants TEXAS EDUCATION AGENCY and BYNUM [to] provide this Court with a copy of the administrative

record in this case, so that this Court, may review the administrative proceedings . . .; and (2) Defendants assume the cost of maintaining Stacey G. at her current educational placement, the Lynne Development Center, during the pendency of a show cause hearing. . . .

On August 5, 1981, this Court held a hearing on plaintiffs' motion for a preliminary injunction. After affording counsel for the parties an opportunity to present evidence and oral argument on the issues raised by plaintiffs' motion, the Court ordered the following:

(1) Further proceedings in the instant cause shall be stayed pending the completion of the administrative hearing set to resume before examiner Mark Berry on August 12, 1981, and the rendition of the hearing officer's "Proposal For Decision". As required by section 71.05.030 of the Texas Education Agency's Policies and Administrative Procedures for the Education of Handicapped Students, the hearing officer shall render his "Proposal For Decision" within 15 days after the close of the evidence;

(2) After the rendition of the hearing officer's "Proposal For Decision", defendants Texas Education Agency and Commissioner Raymon L. Bynum shall provide this Court with a copy of the entire administrative record in this case;

(3) The possibility exists that following the "Proposal For Decision" of the hearing officer, the critical issues precipitating this litigation will be moot. In the event they are not, counsel will give prompt notice and the Court will expedite this case on the docket and its consideration of the outstanding issues including the relief requested by plaintiffs in their motion for preliminary injunction;

(4) Pending the resolution of this cause and the appropriate state proceedings, the defendants shall continue to assume the cost of maintaining Stacey at her current educational placement, as they are required to do so by Section 35.75.-070(E)(iii) of the Texas Education Agency's Policies and Administrative Procedures for the Education of Handicapped Students.

Pursuant to this Court's order, the administrative hearing concerning the proper educational placement for Stacey resumed on August 12, 1981, and was concluded on August 13, 1981. On August 27, 1981, the hearing officer rendered his Findings of Fact and Conclusions of Law [1] reflecting his conclusion that Stacey was "severely mentally retarded with autistic like behaviors." Hearing Officer's Findings of Fact and Conclusions of Law at 16. In addition, the hearing officer ordered that P.I.S.D. convene an admission, review and dismissal committee for the purpose of developing an individualized education program for Stacey. The hearing officer directed also that P.I.S.D. provide counseling services for Stacey's parents, and that P.I.S.D. provide Stacey with a year-round educational program, such program to occur within the district. Finally, the hearing officer ordered that plaintiffs' request for residential placement at the Lynne Developmental Center be denied.

Subsequently, on November 20, 1981, plaintiffs filed a motion for placement of Stacey for the 1981–82 school year, inclusive of the summer, until September 1, 1982. See Motion for Placement. In their motion, plaintiffs seek to have the Court review pursuant to 20 U.S.C. § 1415(e) (1978), the special educational placement

---

1. At the time of the rendition of the hearing officer's Findings and Conclusions, the administrative procedures in effect in Texas directed that following the impartial due process hearing, the hearing officer was to prepare and transmit to the Commissioner of Education a recommended decision or proposal for decision. After reviewing such recommendation, the Commissioner entered a decision. This decision was subject then to review by the State Board of Education. It was a further step of the administrative scheme that the State Board of Education be petitioned for rehearing before proceeding to federal court. During the pendency of the instant proceeding, the administrative regulations were amended. As a consequence thereof, the hearing officer's decision in this case was made final, and the multi-step review process was abolished.

decision regarding Stacey made by the hearing officer. The motion requested further that the Court identify Stacey's current educational needs, and order a placement for her at The Autistic Treatment Center in San Antonio, Texas. Not surprisingly, defendants are opposed to plaintiffs' motion.

On January 8, 1982, the court held an evidentiary hearing at which time the parties were afforded an opportunity to introduce evidence in support of their respective positions regarding Stacey's educational placement. At the conclusion of the hearing, the Court requested additional briefing by the parties and took the motion under advisement. After careful consideration of the evidence and the briefs submitted by counsel, the Court grants plaintiffs' motion in part and denies it in part for the reasons set forth herein.[2]

### Findings of Fact

1. Stacey is the natural child of plaintiffs William and Jane G. and was born on January 19, 1967. Testimony of William G; Record at 1212.[3]

2. During infancy, Stacey began to display abnormal behavior. Testimony of William G; Testimony of Jane G; Record at 1303. At the age of 18 months, Stacey was reportedly irritable, resistive, and showed a preference for repetition of routine. By the age of 20 months, Stacey's condition, rather than improve, declined further. Stacey displayed the following maladaptive behaviors: "[she] screamed at night, demonstrated fear of harmless articles such as a refrigerator, showed no regard for personal safety, engaged in self-stimulatory behavior of jiggling keys and hand regard, had not developed language by 20 months, demonstrated decreased eye contact, and was inaffectionate to her parents except on her own terms." Record at 1303.

3. When Stacey was approximately 30 months old, Stacey was evaluated by Dr. Jim Robinson, a psychiatric consultant affiliated with the Blue Bird Circle Clinic for Pediatric Neurology, Methodist Hospital, in Houston, Texas. Testimony of Jane G. Dr. Robinson diagnosed Stacey as being autistic. Record at 1220, 1303.

4. Autism is a severe disabling condition in which there is generally little or no attempt at verbal communication, disregard for other people and animate objects, excessive self stimulation such as rocking, finger flicking, spinning about, and often a preoccupation with bright or pointed inanimate objects. Testimony of Janean Jarratt; Testimony of Carolyn Garver; Testimony of Donald Minnick; Testimony of Teresa Harrison.

Until recently, autism was thought to be an emotional disorder or psychosis. Testimony of Janean Jarratt; Testimony of Carolyn Garver; Testimony of Donald Minnick. Current research indicates, however, that autism has an organic, neurological base. Testimony of Janean Jarratt; Testimony of Carolyn Garver; Testimony of Donald Minnick; Testimony of Teresa Harrison. Expert testimony developed in the record before the Court reveals a consensus of opinion that autism is *per se* a severe disability. Testimony of Janean Jarratt; Testimony of Carolyn Garver; Testimony of Donald Minnick. Autism is considered also to be a chronic disorder; symptoms may recede but the underlying impairment is permanent. Testimony of Janean Jarratt; Testimony of Carolyn Garver; Testimony of Donald Minnick.

5. Children who are autistic are generally more difficult to manage than severely retarded children, and require greater attention. Testimony of James Clark; Testimony of Donald Minnick. The potential for retarded children is generally regarded as

---

**2.** In order to facilitate an orderly disposition of the instant issues, the Court has opted to utilize the Findings of Fact and Conclusions of Law format prescribed by Rule 52(a), Fed.R.Civ.P., in its treatment of the facts and issues raised by plaintiffs' motion for placement.

**3.** The record referred to here and throughout the Court's Findings of Fact is the evidentiary record prepared during the administrative due process hearing. Such record was introduced into evidence during the hearing before this Court on January 8, 1982.

fixed, whereas the potential for autistic children is unknown. Testimony of Janean Jarratt; Testimony of Carolyn Garver; Testimony of Donald Minnick. Autism has also a slightly more positive prognosis than severe mental retardation. Testimony of Donald Minnick. Autism is further distinguished from mental retardation in that autistic children lack the ability to generalize from one experience to another. Mentally retarded children, however, have such an ability. Testimony of Janean Jarratt; Testimony of Donald Minnick; Testimony of Teresa Harrison. Autistic children are also resistant to change and experience profound social isolation which is not experienced by retarded children with the same I.Q. Testimony of Janean Jarratt. This social isolation can interfere with and alter efforts to mainstream the child. Testimony of Janean Jarratt.

6. Stacey has been enrolled in special education programs since the age of four. From 1971 through 1973, Stacey was enrolled in a federally funded program for autistic children operated by the Galena Park Independent School District (hereinafter G.P.I.S.D.). Testimony of William G.; Testimony of Jane G. For the 1973–74 school year, plaintiff was enrolled in a class for the emotionally disturbed students operated by G.P.I.S.D. pursuant to a contract executed between P.I.S.D. and G.P.I.S.D. Testimony of Jane G.

7. On July 16, 1974, P.I.S.D. evaluated Stacey for the purpose of determining the proper educational placement for Stacey. The examination consisted of the administration of a Stanford Binet Intelligence Scale, Form L–M. This evaluation revealed that at a chronological age of 7.5 years, Stacey was functioning at a mental age of approximately 4 years, 4 months with an approximate I.Q. of 55. It was reported further that these results revealed that Stacey was at that time functioning within the mentally defective range of intellectual development. Record at 1223–25. As a result of this evaluation, the examiner recommended:

that after all conditions are satisfied a place in the [educably mentally retarded] class would be considered for this child. It might be recommended that she attend half day sessions until a more established routine could be achieved. This child has been diagnosed as autistic. With the proper support from EMR class, progress might be noticed, however, the ideal learning situation for Stacy [sic] would be on a one to one basis. It would hopefully be recommended that in time Stacey could attend the [emotionally disturbed] class in PISD.

Record at 1225.

8. On August 12, 1974, the Admission, Review and Dismissal Committee of P.I.S.D. decided to place Stacey in a class for trainable mentally retarded students for the 1974–75 school year. The committee decided further that Stacey might also be placed in a class for emotionally disturbed students on a part time basis. The committee withheld the placement of Stacey into a class for emotionally disturbed students, however, until "after an administrative decision that this would be the best for all concerned." Record at 1131.

At the time of the committee's decision regarding Stacey's placement, the committee also found Stacey eligible for special transportation to and from school as she was educably mentally retarded and displayed the following handicapping conditions: poor communication skills, withdrawn, seizures, poor comprehension, and autistic tendencies. Record at 1132.

9. In the fall of 1974, Stacey was examined by Dr. Irvin A. Craft, an Associate Professor of Psychiatry and Pediatrics at the Baylor College of Medicine. As the result of his evaluation, Dr. Craft found that Stacey "did not appear to be a Kannerian autism patient." Rather, he diagnosed Stacey as being psychotic. Dr. Craft indicated, however, a need for additional data, and accordingly, suggested that Stacey be reevaluated by the Bluebird Clinic and that a "trial of therapy" be performed. Record at 1220–22.

10. At the end of the 1974–75 school year, the Admission, Review and Dismissal Committee of P.I.S.D. reconvened to consider Stacey's placement for the upcoming school year. The committee decided to place Stacey in a class for emotionally disturbed students. Record at 1133. The committee decided that Stacey was eligible once again for special transportation. In addition to those conditions noted by the committee in its decision for the 1974–75 school year, the committee noted that Stacey displayed the following handicapping characteristics: poor contact with reality, short attention span, hyperactive, and psychotic. Record at 1134.

11. Stacey's placement in a class for emotionally disturbed children was maintained through the 1978–79 school year. Record at 1135–1137.

12. On October 14, 1975, Dr. Donald J. Minnick, a clinical psychologist, developed a therapeutic/educational plan for Stacey. In the plan, Dr. Minnick advised that Stacey's communication skills should be developed further and that Stacey should be required to maintain eye contact with the teacher when given instructions. Dr. Minnick devised also a form of instruction in order to decrease Stacey's tendency toward perseveration, and in order to develop Stacey's ability to perform a variety of tasks. Finally, Dr. Minnick stressed that Stacey should be encouraged to interrelate with her peers. Record at 1214.

13. As he had done in 1975, Dr. Minnick developed a therapeutic/educational plan for Stacey in January, 1976. This plan was directed at improving and developing Stacey's constructive behavior and conversational speech. Record at 1215–16.

14. In 1977, Stacey was examined at the University of Houston College of Optometry to determine if Stacey's vision problems were a contributing factor to her poor performance in school. Record at 1218. During the examination, the clinician noted that Stacey continually expressed a fear of being hurt. Accordingly, in order to examine Stacey, the clinician was required to coax and reassure Stacey that she would not be harmed. Due to Stacey's state of mind, the clinician stated that "it was difficult to determine whether her performance on various tests were the result of extreme fear and withdrawal or from actual perceptual and motor deficits." Record at 1218. Nevertheless, despite these difficulties, the clinician concluded "that Stacey had the ability to perform beyond her present level. Her current perceptual performance age seems to be between two and three years." Record at 1219.

15. On May 16, 1977, Stacey was re-evaluated at the request of P.I.S.D. Stacey's academic performance level was evaluated through the utilization of certain tasks appearing in the Wide Range Achievement Test. At this evaluation, Stacey was given also the Peabody Picture Vocabulary Test; the results of this test revealed that Stacey, at the chronological age of 10 years, 4 months, had the mental age of 3.9 and an approximate I.Q. of 38. In addition, the AAMD Adaptive Behavior Scale, Part I, was administered. This exam indicated that Stacey's adaptive behavior was comparable to the behavior of a trainable mentally retarded child. Record at 1212. At the conclusion of his report, the examiner recommended that a statement be obtained from a clinical psychologist "regarding the degree to which emotionality accounts for Stacey's low present performance." Record at 1212.

16. In response to this recommendation, Dr. Minnick examined Stacey on June 1, 1977. In a report prepared after the examination, Dr. Minnick states that his evaluation revealed that Stacey was suffering from a significant and severe personality disturbance which interfered with her ability to function more adaptively within the school setting. Record at 1213. Dr. Minnick stated further that despite test results indicating that Stacey was functioning in the mentally defective range, Stacey's low performance on the tests conducted at the May 16 evaluation was functional in origin and based in part on a severe personality disturbance. Consequently, Dr. Minnick concluded that this disturbance made it

"difficult to estimate a more accurate level of intellectual functioning at the present time." Record at 1213.

17. On May 25, 1978, Stacey's parents took Stacey to the Blue Bird Circle Clinic for Pediatric Neurology in Houston, Texas for re-evaluation. The examination of Stacey consisted, in part, of the administration of the following tests: the Stanford Binet Intelligence Scale, Form L–M, Peabody Picture Vocabulary Test, Beery Developmental Test of Visual-Motor Integration, Draw-A-Person, and Wide Range Achievement Test. Testimony of Janean Jarratt; Record at 1269. The results of these tests revealed that Stacey had a Stanford Binet I.Q. of 33, a mental age of 4.1, and a visual motor integration age of 3.0. The tests revealed further that Stacey had a reading grade level of 1.8, a spelling equivalent of N.8 (nursery-eight) and arithmetic skills of Kg.6 (kindergarten-six). Testimony of Janean Jarratt; Record at 1269–70. Consequently, as reported in a letter from the clinic's medical director, Thomas E. Zion, M.D., it was concluded that "[t]he neurological evaluation at this time was within normal limits except for the patient's obvious retardation and autistoid behaviors." Record at 1267. Dr. Zion diagnosed further that "[o]ur impression is mental retardation with autistic behavior." *Id.*

On the basis of Stacey's evaluation, Janean Jarratt, an educational diagnostician employed by the clinic, who took part in the examination of Stacey, stated that:

> Stacey has many special needs which include a highly structured very low stress, sheltered environment. Stacey would profit from residential school placement. A program emphasizing improvement of self-care skills and basic vocational training would take her needs into account. Due to her present lack of ability to sustain her attention and interest without direct supervision, it would be necessary to provide her with much personal supervision.

Record at 1270; Testimony of Janean Jarratt.

18. In the summer of 1978, Stacey's parents decided to place Stacey in the Avondale House in Houston. Testimony of William G.; Testimony of Jane G. Avondale House is a private residential facility that provides services to parents of handicapped children; such services consisting of day care, baby sitting, etc. Testimony of James Clark; Testimony of William G.; Testimony of Jane G.

19. In the fall of 1977 and continuing through the 1978–79 school year, P.I.S.D. enrolled Stacey in a class for children who had been diagnosed as autistic or who exhibited autistic behavior. Testimony of Dorothy Edmonson; Record at 1154–61. During Stacey's enrollment in this class, there were from 3 to 5 children in this class ranging in age from 9 to 15 or 16. Testimony of Dorothy Edmonson.

The teacher of this class was Dorothy Edmonson, a teacher certified in special education for approximately 19 years, but one who had never worked with truly autistic children. Testimony of Dorothy Edmonson. Ms. Edmonson was assisted in this class by an uncertified aide. Testimony of Dorothy Edmonson.

20. During her enrollment in Ms. Edmonson's special education class, apparently Stacey's behavioral problems began to diminish. As Ms. Edmonson testified at the hearing, certain of the behavior abnormalities that Stacey had once exhibited, such as temper tantrums, aggressiveness, obsessive television watching, inappropriate vocalizations, masturbation and other forms of self-stimulatory behavior, had disappeared or had been reduced. *See also* Testimony of Jane G. Stacey also began to enjoy the company of other children and began to develop interpersonal relationships with other children. Testimony of Dorothy Edmonson. Stacey's academic skills improved also during this time. Stacey's vocabulary increased and her communication skills improved, and she developed some ability in arithmetic. Stacey increased also her self-help skills. Testimony of Dorothy Edmonson; Testimony of Jane G. *See also* Record at 1156–1161. In spite of the marked im-

provement that Stacey exhibited in the aforementioned areas during her two year enrollment in Ms. Edmonson's class, Stacey's fine motor skills remained poor. Testimony of Dorothy Edmonson.

21. On September 19, 1978, the Admission, Review and Dismissal Committee of P.I.S.D. held a meeting for the purpose of developing an Individual Education Program (hereinafter IEP) for Stacey.[4] The program developed by the committee provided for speech therapy and recommended that Stacey be placed "in a self-contained class for Stacey's academic subjects." In addition, the program provided for special transportation. Finally, the program established three annual goals. Record at 1162. The program did not include, however, a statement of Stacey's present level of educational performance, nor a statement of the specific educational services which were to be provided to Stacey. Finally, while the program did include projected dates for special and related educational services, the program did not provide for any evaluation procedures or any method of determining whether the instructional objectives listed in the program were being achieved. Record at 1162.

22. Later that same month, Stacey's mother once again met with an administrator of the district and Stacey's instructor Ms. Edmonson. Additionally, a therapist, Gilbert DeLeon, was in attendance. Record at 1169. Apparently, the purpose of the meeting was to formulate a speech therapy educational plan for Stacey for the 1978–79 school year. The plan indicates that Stacey had certain language deficiencies, e.g., answering simple questions, phrasing simple statements and the inability to carry on a conversation. These deficiencies were attributed to Stacey's autistic tendencies. Record at 1169. Besides noting the problems set forth above, the plan formulated three goals which the speech therapist would attempt to achieve with Stacey through therapy. Record at 1169.

23. On March 29, 1979, Carla Motley, a speech therapist employed by P.I.S.D. who had worked with Stacey during the 1978–79 school year, recommended that Stacey continue in speech therapy for one hour per week in the upcoming school year. Ms. Motley set also three long range goals which she hoped Stacey would meet. Record at 1172.

24. On May 2, 1979, the Admission, Review and Dismissal Committee of P.I.S.D. developed an IEP for Stacey for the 1979–80 school year. The committee was comprised of an administrator of the district, a person whose title was "appraisal", Stacey's instructor, and Stacey's mother. Once again, the IEP prepared for Stacey failed to contain a statement of Stacey's then present levels of performance, or assessment data from which such a statement could be made. In fact, it was stated in the IEP that academic achievement data, as well as pre-vocational/vocational skills data for Stacey were unavailable, and in some instances such areas were not assessed at the time of the preparation of the program. The report mentioned that Stacey exhibited autistic behavior, had poor fine motor skills and allergies. The report formulated also four annual goals. Absent once again, however, were evaluation procedures or any other method of determining whether the four goals listed in the IEP were being met.

25. At the time of the preparation of the IEP, P.I.S.D. had never conducted a comprehensive evaluation of Stacey other than limited examinations on July 16, 1974, Refer to Finding 7, and May 16, 1977. Refer to Finding 15. P.I.S.D. has never performed a comprehensive assessment of Stacey which included an evaluation of Stacey's physical, mental and emotional condition, her educational performance levels or her learning abilities.

26. In the summer of 1979, Stacey's parents placed her in the Lynne Developmental Center, Testimony of William G., Testimony of Jane G., a private, non-profit residential school for mentally retarded, emotionally

---

4. Those persons in attendance at the meeting included an administrator, Ms. Wanda Ellis, Stacey's teacher Ms. Edmonson, and Stacey's mother.

disturbed and autistic children. The school is located in Richardson, Texas. Testimony of Carolyn Garver.

27. After placing Stacey in the Lynne Developmental Center, Stacey's parents approached the school district and requested that the school district pay for Stacey's residential placement. P.I.S.D. refused this request. Testimony of William G. In the fall of 1979, Stacey's parents decided not to re-enroll Stacey in the P.I.S.D. for the 1979–80 school year. Rather, they decided to keep Stacey at the Lynne Developmental Center. Testimony of William G.

28. On November 26, 1980, Stacey was evaluated at her parent's request by The Blue Bird Clinic for Pediatric Neurology. Testimony of William G. On this occasion only an intellectual evaluation was performed. The results of the evaluation revealed that Stacey had "earned a Stanford Binet I.Q. of 33, which corresponds to the AAMD classification of Severe Mental Retardation." Record at 1271. Accordingly, Ms. Jarratt concluded as follows:

> The available data indicates Stacey continues to function intellectually within the AAMD classification of Severe Mental Retardation. She continues to have significant difficulty with language as well as articulation. Psychomotor functioning was also grossly impaired. However, Stacey's social-adaptive behaviors showed significant improvement. For example, she was able to sit for long periods of time and attempted all tasks presented. She had increased verbalizations. No stereotyped or repetitive behaviors such as rubbing her eyebrow or smoothing her dress were documented. When considering the data obtained it would appear that Stacey would certainly benefit from continued placement in a program which is highly structured, gives direct supervision, and is centered around a behavior modification program. Stacy would benefit from placement in a 24-hour, twelve month program.

Record at 1273.

29. On December 8, 1980, Stacey's parents met with Ms. Wanda Ellis, a special education supervisor with P.I.S.D. The purpose of the meeting was to present the district with the most recent intellectual evaluation of Stacey, an evaluation conducted by the Bluebird Clinic, and to discuss the district's special education program. Testimony of William G.; Testimony of Wanda Ellis. Stacey's parents explored also with Ms. Ellis the possibility of the district providing Stacey with a residential placement. Testimony of William G.; Testimony of Wanda Ellis. Because of the progress that Stacey had made while at the Lynne Developmental Center, Stacey's parents wanted to continue Stacey's placement at the Center or in a similar residential program. Testimony of William G. *See also* Testimony of Wanda Ellis.

30. In response to Stacey's parents' request for a residential placement for Stacey, Ms. Ellis stated that the district did not provide residential placement for a handicapped child if the district felt that it could provide educational services for the child. Ms. Ellis stated further that since the district had not seen Stacey for two years, the district was unable at this time to make a decision regarding the proper placement for Stacey. Testimony of Wanda Ellis.

31. After the conclusion of the meeting between Ms. Ellis and Stacey's parents, Ms. Ellis did not arrange for any further evaluation of Stacey. Ms. Ellis testified at the due process hearing that she felt that such an evaluation was not necessary unless Stacey's parents requested a meeting of the district's Admission, Review and Dismissal Committee. Testimony of Wanda Ellis. Lewis Anderson, Director of Special Education for P.I.S.D. testified, however, that after the meeting in December, 1980 it would have been an appropriate time to conduct a meeting of the district's Admission, Review and Dismissal Committee to review Stacey's placement. Testimony of Lewis Anderson. The failure of the district to convene an Admission, Review and Dismissal Committee meeting was one of the precipitating events for Stacey's parents' requesting an administrative due process hearing.

32. P.I.S.D.'s Admission, Review and Dismissal Committee has never recommended a private residential placement for a handicapped child. Consequently, P.I.S.D. has never made such a placement. Testimony of Lewis Anderson.

33. On January 21, 1981, plaintiffs requested a state administrative due process hearing pursuant to 20 U.S.C. § 1415 (1975), and sections 71.05.010 and 71.05.020 of the Texas Education Agency Administrative Procedures, alleging that P.I.S.D. had (1) failed to hold an individualized education plan meeting or develop an IEP for Stacey, as required by law; (2) failed to either consider or pay for an independent evaluation supplied to the defendant district by the parents, such evaluation recommended a residential placement for Stacey; and (3) failed to provide a free appropriate public education for Stacey since 1979. Record at 7–. *See also* Stipulations Concerning Due Process Hearing filed in this cause on August 5, 1981 (hereinafter Stipulation).

34. On January 26, 1981, Annette Hewgley, Administrative Assistant to the Office of General Counsel, Texas Education Agency, acknowledged receipt of plaintiffs' request for a hearing and informed the interested parties that Ms. Jean Bilger had been appointed as the hearing officer in the case. Stipulation. The due process hearing was commenced on February 19, 1981 with the taking of evidence. Stipulation. Pursuant to mutual agreement, the hearing was reconvened on March 11 and March 16, 1981. Stipulation.

35. After the termination of the evidence on March 16, 1981, the hearing officer announced that she would seek an independent evaluation of Stacey; the cost of such evaluation being sustained by the Texas Education Agency. Stipulation. The hearing officer stated further that the hearing would not be reconvened until the independent evaluation had been completed. Stipulation.

36. Shortly after the hearing was adjourned on March 16, 1981, Ms. Bilger resigned from her position as hearing officer and moved to Virginia. Subsequently, Mr. Mark Berry was appointed by the Commissioner of Education to preside as hearing officer over further proceedings in the case. Stipulation.

37. On May 5, 1981, Stacey's parents authorized an independent educational evaluation of Stacey by Region X Education Service Center in Richardson, Texas. Region X acquired then the services of the University Affiliated Center for Developmentally Disabled Children of the University of Texas Health Science Center at Dallas (hereinafter UAC), and a multidisciplinary team of professionals was appointed to conduct a thorough evaluation of Stacey. Record at 43, 46–56.

38. On May 12 and 18, 1981 the UAC team examined Stacey; such examination consisted of a physical exam, an emotional and behavioral status evaluation, a sociological review, and an evaluation of Stacey's intellectual capabilities. In addition, Stacey's educational performance levels and learning competencies were examined and assessed. The evaluation revealed that Stacey was severely mentally retarded with some autistic behaviors, Record at 52, and pursuant to the Policies and Administrative Procedures for the Education of Handicapped Children established by the State of Texas, Stacey did not meet the criteria for a diagnosis of autism. More specifically, the evaluation indicated that:

> Stacy [sic] was generally cooperative during the visit at the Lynne Development Center as well as during the evaluation at the University Affiliated Center. Stacy [sic] appears to currently be functioning in the severe range of mental retardation with areas of strength being demonstrated in the area of language and reading vocabulary. Her adaptive behaviors appear to be at a level similar to her level of intellectual functioning with her self-help skills being better than her locomotion and socialization skills as defined by the Vineland Scale of Social Maturity. Academically, Stacy [sic] appears to have learned certain academic skills such as sight reading but they do not appear to

be functional because she is not able to comprehend the things that she is able to read. This is most likely an artifact of her level of cognitive and language functioning. While Stacy [sic] exhibits some behaviors that could be considered as autistic, it is felt that at the time of the current evaluation she us [sic] functioning more as a mentally retarded child with some autistic behaviors as opposed to a child with a primary diagnosis of autism. It should be emphasized that this diagnosis is a description of Stacy's [sic] current behaviors and are subject to change if the behaviors were to change.

Record at 52. Accordingly, the UAC recommended as follows:

1. Stacy [sic] needs continued special educational services in a program that is geared to assist someone who is functioning at her developmental level.

2. As it appears that Stacy [sic] is capable of learning skills, it is important that her educational experiences be geared to practical life skills as opposed to academics. It emerged in the evaluation that she already has many of the academic skills, but she is not able to use them in an applied way to deal with real life situations and thus they are not functional. Her educational program should be geared toward pre-vocational types of activities until the time that she can be more fully engaged in sheltered workshop type training activities. A curriculum similar to Skills for Achieving Independent Living (SAIL) would appear to be appropriate for Stacy [sic].

3. Assistance in improving her language through improving her sentence structure may be beneficial.

4. Stacy [sic] needs a structured environment for learning. She needs to be shown as well as told what the task is that she is to do and then given the guidelines for completing it. Within this structured environment, Stacy [sic] needs to function as inde-pendently as possible. For cooperation and task-related behavior appears to be of such a nature that this should be possible. It does not appear that there is a need at this time for a one to one primary reinforcement but rather only clearly structured activities.

5. If Stacy [sic] returns to the public schools, a program to assist the parents in providing a structured environment at home may be needed. The parents, if they feel that this assistance is needed may find resources through MHMR or the local Association for Retarded Children.

Record at 52–53.

39. Shortly after Stacey was evaluated by the multidisciplinary team from the UAC, Stacey's parents had Stacey examined by the Developmental Evaluation Service of the Dallas County Mental Health and Mental Retardation Center (hereinafter DES). Once again, Stacey was subjected to a thorough evaluation consisting of the following components: social, medical, psychological, educational, and speech. This evaluation resulted in the general diagnosis that Stacey met "the criteria for Infantile Autism and her mental retardation is considered secondary." Record at 1301–02. This diagnosis, together with the results of the other facets of the evaluation, resulted in the recommendations that:

1. The most appropriate residential placement for Stacey would be a highly structured setting which utilizes techniques of behavior modification and is designed for the autistic individual's unique training needs. Optimal opportunities for skill development and behavior control can best be offered in a 24 hour continuous program. Stacey should continue to receive academic training using a functional curriculum and teaching strategies and techniques applicable to the autistic individual. In addition, further training in socialization, grapho-motor, pre-vocational, and language development is recommended.

2. It is recommended that the parents remain involved in Stacey's programming so that they can effectively follow through with programming goals during her visits home. Counseling is also suggested to help Mrs. [G.] resolve some of her feelings of ambivalence and to help her prepare for Stacey's possible return to the home.

Record at 1302.

40. As a result of the necessity of having to appoint another hearing officer after Ms. Bilger left the State of Texas to reside in Virginia, the complications caused by such change, the delay in the completion of the independent evaluation of Stacey as ordered by the hearing officer, and the problems in coordinating the schedules of all those involved in the hearing, see Stipulation, the due process hearing had not resumed at the time the instant suit was filed, and as mentioned earlier, did not reconvene until so ordered by this Court.

41. A comparison of the diagnoses of Stacey by the two multidisciplinary teams referred to above reveals an apparent inconsistency of opinion as to Stacey's handicapping condition. As stated earlier, the complement of professionals from UAC examining Stacey diagnosed Stacey as severely retarded with some autistic behaviors, Refer to Finding 38, while the team of professionals from DES diagnosed Stacey as being afflicted with infantile autism, and secondarily, mental retardation. Refer to Finding 39. Consequently, the Court, although presented with the results of two very thorough medical evaluations, is left with the dilemma of having to accept one multidisciplinary team's diagnosis while rejecting the other. This Court's decision is complicated further by the apparent fact that the classifications utilized by professionals in the field are frequently blended into one another. Testimony of Janean Jarratt; Testimony of Cindy Michaels; see also Testimony of Donald Minnick; Testimony of Teresa Harrison. This observation is supported by the varying diagnoses and labels Stacey has received since infancy: "autistic", Refer to Finding 3, "functioning within the mentally defective range of intellectual development", Refer to Finding 7; "educably mentally retarded", Refer to Finding 8; "psychotic", Refer to Finding 9; "adaptive behavior was comparable to the behavior of a trainable mentally retarded child", Refer to Finding 15; "severe personality disturbance", Refer to Finding 16; "mental retardation with autistic behaviors", Refer to Finding 17; "severe mental retardation", Refer to Finding 28; "severely retarded with autistic behaviors", Refer to Finding 38; and "infantile autism, and secondarily, mental retardation", Refer to Finding 39.

Compounding the Court's difficulty in determining the nature of Stacey's affliction also are the diametrically opposed positions taken by each of the parties to this suit. Plaintiffs contend that Stacey is autistic, while the district, although at one time of the opinion that Stacey's main handicapping condition was autism, Testimony of Lewis Anderson, see also Testimony of Dorothy Edmonson, asserts now that Stacey should be classified as severely mentally retarded. At the evidentiary hearing before this Court, however, counsel for defendants asserted that regardless of whether Stacey is autistic or mentally retarded with autistic behaviors, P.I.S.D. can provide educational services for Stacey.

This Court, faced with the Herculean task of donning the hat of a medical expert and determining the nature of Stacey's handicap, is reluctant to place undue stress on labeling at the expense of the appropriate placement for Stacey. Rather, the Court will refrain from making a finding regarding Stacey's disability, and will instead address later in the Court's Conclusions of Law, the first and foremost issue presented by the motion now before the Court: What is the appropriate educational placement for Stacey at the present time in light of her unique needs.

42. during the earlier stage of the due process hearing in February, 1981, Carolyn Garver, a counselor, special educator, and behavioral specialist with the Lynne Developmental Center who had been involved

with Stacey since her placement with the Center in the Summer of 1979, testified that in six to twelve months from that time, Stacey would be able to leave the Center and return to a lesser restrictive environment. Testimony of Carolyn Garver.

43. During the 1981–82 school year, Stacey was removed from the Lynne Developmental Center and placed in the Autistic Treatment Center located in San Antonio, Texas. Testimony of Monty Parker. The Autistic Center and the Lynne Developmental Center are owned by the same corporation, and both centers employ basically the same programs, i.e., a highly structural behavioral modification program. Testimony of Monty Parker.

44. P.I.S.D. presently provides educational services to autistic children and children who are mentally retarded. Testimony of Donald Minnick.

45. P.I.S.D. does not presently offer a year-round or summer school program for any of its students who are autistic, mentally retarded, or emotionally disturbed, except for a program which is provided to multi-physically handicapped, deaf or blind students. Testimony of George Anderson; Testimony of Donald Minnick. In addition, the district does not have any definitive plans for a summer program to facilitate students with unique needs similar to Stacey's. Testimony of George Anderson.

46. Because of the nature of Stacey's handicapping condition, Stacey will suffer a serious regression of educational achievement and develop behavioral problems if there is a long interruption in her academic programming; such regression is likely to occur during the usual three month summer break. Testimony of Cynthia Michaels; Testimony of Teresa Harrison; Testimony of Monty Parker.

47. For the factual and legal reasons hereinafter outlined in the Conclusions of Law, the Court finds that the appropriate educational placement and procedures to be followed for Stacey are those articulated in Conclusions of Law 11 through 15.

### Conclusions of Law

1. In 1975, the Congress of the United States enacted into law the Education for All Handicapped Children Act of 1975, Pub. L.No. 94–142, 89 Stat. 773 (codified at 20 U.S.C. §§ 1400 et seq. (1978 & Supp.1982)). The Act was enacted "in response to the need for increased funding brought about by the widespread recognition by the courts and state legislatures of the right of handicapped children to an adequate education." Note, Enforcing the Right to an "Appropriate" Education: The Education for All Handicapped Children Act of 1975. 92 Harv.L.Rev. 1103 (1979). See 20 U.S.C. § 1400 (Supp.1982). See also MacMurray, Public Law 94–142 and The Texas View, 12 St. Mary's L.J. 180 (1980); Haggerty & Sacks, Education of the Handicapped: Towards a Definition of an Appropriate Education, 50 Temp.L.Q. 961 (1977); Note, The Education of All Handicapped Children Act of 1975, 10 U.Mich.J.L.Ref. 110 (1976). For the legislative history of the Act see 1975 U.S.Code Cong. & Ad.News 1425.

The Act establishes a program of cooperative federalism by providing for the distribution of funds to the states electing to participate under its provisions; such funds are to assist state and local educational agencies in the appropriate education of handicapped children. 20 U.S.C. § 1400 (Supp.1982). States electing to participate in the program must demonstrate to the United States Commissioner of Education both that it has put into effect "a policy that assures all handicapped children the right to a free appropriate public education", 20 U.S.C. § 1412(1) (1978); 34 C.F.R. § 104.33 (1981) [5]; see also Tatro v. State of Texas, 625 F.2d 557, 561 (5th Cir. 1980); Gladys J. v. Pearland Indep. School Dist., 520 F.Supp. 869, 873–74 (S.D.Tex.1981);

**5.** 34 C.F.R. § 104.33 requires recipients of federal funds that operate public elementary or secondary programs to "provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap." 34 C.F.R. § 105.33a (1981).

*Rowley v. Board of Education,* 483 F.Supp. 536 (S.D.N.Y.1980), *aff'd,* 632 F.2d 945 (2d Cir. 1980), *cert. granted,* 454 U.S. 961, 102 S.Ct. 500, 70 L.Ed.2d 376 (1981); *Boxall v. Sequoia Union High School Dist.,* 464 F.Supp. 1104, 1107–08 (N.D.Cal.1979); *Lora v. Board of Educ. of City of New York,* 456 F.Supp. 1211, 1226 (E.D.N.Y.1978), *vacated on other grounds,* 623 F.2d 248 (2d Cir. 1980); *Howard S. v. Friendswood Indep. School Dist.,* 454 F.Supp. 634 (S.D.Tex.1978; 20 U.S.C. § 1414(a)(1)–(7) (1978), and that it has met the other requirements listed in section 1412 of Title 20, including the establishment of educational priorities and procedural safeguards. As an additional prerequisite for the receipt of federal funding under the Act, the participating state must submit to the Commissioner a detailed state plan including numerous policies and procedures, *see* 20 U.S.C. § 1413 (1978), designed to ensure that the state's handicapped children are identified, individually evaluated, and provided appropriate education. *See M. R. v. Milwaukee Pub. Schools,* 495 F.Supp. 864, 868–69 (E.D.Wis.1980). The State of Texas has elected to participate under the provisions of the Act in order to receive federal funding for the purpose of providing educational services to handicapped children through local school districts and special education cooperatives. Tex.Educ.Code Ann. § 16.104 (Vernon Supp.1982). For a historical survey of Texas law on special education, *see generally* MacMurray, *Public Law 94–142 and The Texas View, supra.*

2. The Act provides also extensive procedural rights to the parents or guardians of handicapped children who feel that the schools are not providing their children an appropriate education. These procedural guarantees include the right to a due process hearing before either a local, state or intermediate state educational agency, "as determined by State law or by the State educational agency," and the right to "bring a civil action ... in a district court

of the United States...." *See* 20 U.S.C. § 1415(b)(2), (e)(2) (1978).[6]

3. The legislative history of the Act is not illuminating on the scope of the court's review of a state administrative decision, except that it clarified the court's duty to take evidence additional to the administrative record and to reach an independent decision using the standard of "preponderance of the evidence":

The provisions of existing law with respect to judicial action are clarified and strengthened to assure that any party aggrieved by the findings and decision rendered in the due process hearing or the State educational agency review of such hearing shall have the right to bring a civil action with respect to the original complaint and matters relating thereto. Such action may be brought in any State court of competent jurisdiction or in a district court of the United States and in any such action the court shall receive the records of the due process hearing (and where appropriate the records of the review of such hearing), shall hear additional evidence at the request of any party, shall make an independent decision based on a preponderance of the evidence and shall grant all appropriate relief.

S.Rep. No. 455, 94th Cong., 1st Sess., *reprinted in* 1975 U.S.Code Cong. & Ad.News 1425, 1503. *See Kruelle v. New Castle County School Dist.,* 642 F.2d 687, 692 (3rd Cir. 1981) ("The statute contemplates a *de novo* review by the district courts, including the hearing of additional evidence and an independent decision by the district courts based on the preponderance of the evidence."); *Scruggs v. Campbell,* 630 F.2d 237, 238 (4th Cir. 1980). *See also* 20 U.S.C. § 1415(e)(2) (1978).

4. This Court's duty under 20 U.S.C. § 1415(c) to review the evidence and grant appropriate relief requires at a minimum that Stacey G. be afforded a free appropriate public education "for the 1981–82 school

**6.** For a summary of the administrative procedures established under the Education for All Handicapped Children's Act of 1975, see Note, *Enforcing the Right to an "Appropriate" Edu-* *cation: The Education for All Handicapped Children Act of 1975,* 92 Harv.L.Rev. 1103 (1979).

year, inclusive of the summer, until September 1, 1982."[7,8] Motion for Placement at 1. As stated earlier, the parties are in disagreement as to the appropriate placement for Stacey. Defendants assert that the Pasadena Independent School District is capable of providing an appropriate school placement for Stacey, while plaintiffs assert that the appropriate placement for Stacey, at least until September 1, 1982, is the Autistic Treatment Center in San Antonio, Texas. Refer to Finding 41. There is no dispute, however, that Stacey is handicapped within the meaning of the Act, 20 U.S.C. § 1401(1) (1978); 34 C.F.R. § 300.-5(a) (1981). Refer to Findings 38, 39. Nor is there any question that Stacey is entitled to a free appropriate public education.

5. To determine the requisites of the free appropriate public education to which handicapped children are entitled to under the Act, the Court must first look to the Act itself and its legislative history for guidance. Section 1401(18) of Title 20 defines generally a "free appropriate public education" as consisting of a:

> special education and related services which (A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State educational agency, (C) include an appropriate preschool, elementary, or secondary school education

in the State involved, and (D) are provided in conformity with the individualized education program required under section 1414(a)(5) of this title.

20 U.S.C. § 1401(18) (1978); *see also* 34 C.F.R. § 300.7 (1981). "Special education" is defined as: "specially designed instruction, at no cost to parents or guardians, *to meet the unique needs of a handicapped child,* including classroom instruction, instruction in physical education, home instruction, and instruction in hospitals and institutions." 20 U.S.C. § 1401(16) (1978) (emphasis added); *see also* 34 C.F.R. § 300.-14 (1981). "Related services" are those services which "may be required to assist a handicapped child to benefit from special education...." 20 U.S.C. § 1401(17) (1978); *see also* 34 C.F.R. § 300.14 (1981). These services include transportation and developmental, corrective, and supportive services such as speech pathology, audiology, recreation, psychological services, certain medical services, physical and occupational therapy, and counseling services. Consequently, it has been stated generally that a "free appropriate education is one which (1) meets reasonable state educational standards, and (2) provides specially designed instruction and related services to meet the unique needs of handicapped children." *Gladys J. v. Pearland Indep. School Dist., supra,* at 875, citing, 20 U.S.C. § 1401(16)–(19).

7. Discussions of the role of federal courts in the area of the education of handicapped children can be found in the following: Note, *Enforcing the Right to an "Appropriate" Education: The Education for All Handicapped Children Act of 1975, supra;* Haggerty & Sacks, *Education of the Handicapped: Towards a Definition of an Appropriate Education,* 50 Temp.L.Q. 961 (1977); Note, *The Education of All Handicapped Children Act of 1975,* 10 U.Mich.J.L. Ref. 110 (1976).

8. Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (Supp.1981), which has been alleged by plaintiffs in their complaint as a basis for the relief being requested in the motion now before this Court, provides also a private cause of action for the enforcement of the right of a handicapped child to receive an appropriate education. *S–1 v. Turlington,* 635 F.2d 342 (5th Cir. 1981); *Tatro v. State of Texas,* 625 F.2d 557 (5th Cir. 1980); *Gladys J. v. Pearland Indep. School Dist.,* 520 F.Supp. 869, 874 (S.D.Tex.1981); *Georgia Ass'n of Re-*

*tarded Citizens v. McDaniel,* 511 F.Supp. 1263 (N.D.Ga.1981); *Boxall v. Sequoia Union High School Dist.,* 464 F.Supp. 1104 (N.D.Cal.1979); *Doe v. Marshall,* 459 F.Supp. 1190 (S.D.Tex. 1978), *Howard S. v. Friendswood Indep. School Dist.,* 454 F.Supp. 634 (S.D.Tex.1978). Although technically a cause of action under Section 504 of the Rehabilitation Act provides plaintiffs with a separate basis for relief, the discussion of the issues raised by plaintiffs' motion will focus upon the provisions of the Education for All Handicapped Children Act of 1975, 20 U.S.C. §§ 1400 *et seq.* (1978 & Supp. 1982), (hereinafter Act). *See Gladys J. v. Pearland Indep. School Dist., supra,* at 874; *Howard S. v. Friendswood Indep. School Dist., supra,* at 637. As indicated by the regulations accompanying section 504, a school system will provide the "free and appropriate education" and procedural safeguards required under section 504 by complying with the Act. *See* 34 C.F.R. §§ 104.33(b), 104.36 (1981).

6. Under the Act, the IEP gives substance to the required "free appropriate public education." The IEP consists of a written statement developed in a meeting among the child's parents, teacher, a qualified representative of the local educational agency, and finally the child whenever appropriate. *See S–1 v. Turlington,* 635 F.2d 342, 347 (5th Cir.) ("Under 45 C.F.R. § 121a.533(a)(3)[9] and 45 C.F.R. § 84.-35(c)(3), evaluations must be made by a specialized and knowledgeable group of persons."), *cert. denied,* 454 U.S. 1030, 102 S.Ct. 566, 70 L.Ed.2d 473 (1981); *Armstrong v. Kline,* 476 F.Supp. 583, 586–87 (E.D.Pa. 1979), *rev'd on other grounds sub nom., Battle v. Commonwealth of Pennsylvania,* 629 F.2d 269 (3rd Cir. 1980). *See also* 20 U.S.C. § 1401(19) (1978); 34 C.F.R. § 300.-345 (1981); Tex.Admin.Code tit. 19 § 89.214

(1981).[10] Specifically, the IEP must include:

(A) a statement of the present levels of educational performance of such child, (B) a statement of annual goals, including short-term instructional objectives, (C) a statement· of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs, (D) the projected date for initiation and anticipated duration of such services, and (E) appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved.

20 U.S.C. § 1401(19) (1978); 34 C.F.R. § 300.346 (1981); Tex.Admin.Code tit. 19 § 89.214(b)(4) (1981).[11]

**9.** 45 C.F.R. § 121a.533(a)(3) has been redesignated as 34 C.F.R. § 300.533(a)(3) (1981).

**10.** Section 89.214(b) provides in pertinent part:
A student receives special education services only after a comprehensive multidisciplinary team, including the parent when possible, has reviewed the data from all three stages of the comprehensive assessment; has determined that the student has a physical/mental/emotional disability establishing eligibility to receive special education services; has determined whether or not the student has an educational need significant enough to merit special education instruction; has provided an individual educational plan, complete with statements or short-term objectives, long-range goals, instructional and related services to be delivered; and has provided for an educational placement in the least restrictive educational environment.

**11.** Section 89.214(b)(4) states:
The individual educational plan developed by the admission, review, and dismissal committee for each student includes:
(A) A statement of the student's present competencies taken from the assessment data. This brief statement includes:
(i) the competencies of the student in academic content areas. If the student is functioning at pre-academic levels, there must be a statement of developmental skills;
(ii) the physical abilities and disabilities exhibited by the student which would affect his or her participation in instructional settings and/or in physical education and leisure time activities;
(iii) the behaviors demonstrated by the student which affect his or her educational programming; and

(iv) the skills demonstrated by the student (particularly at the secondary level) which may be prerequisite to participation in vocational education.
(B) A statement of annual goals and short-term instructional objectives. All goals and objectives are stated within the context of a planned, sequential curriculum and with consideration for the student's needs in both content and developmental areas.
(i) Annual goals are broad statements of the highest educational priorities identified for the student for the current program year.
(ii) Short-term instructional objectives are measurable intermediate steps designed to lead the student to achievement of the annual goals. While these objectives will be more specific than the annual goals, it is not intended that they be as specific as the teacher's daily or weekly lesson plans for the student. The statement of each objective will be accompanied by a designation of the person or persons responsible for implementing activities designed to help the student achieve the objective and may include a statement of any special materials, resources, or methods which should be used in achieving the objective.
(C) A statement of the specific educational services to be provided for the student, including regular education, special education, and related services. The services provided will be directly related to the stated goals and objectives. Services will be provided within the least restrictive environment appropriate for the student.
(D) A statement of the amount of time to be spent in each setting, the projected dates for initiation of services, the anticipated du-

The Act and the regulations thereunder require the local school district or educational agency to formulate and revise annually an IEP for each handicapped child.[12] 20 U.S.C. § 1414(a)(5) (1978); 34 C.F.R. 300.341 (1981). "The failure to perform this analysis and structure a program suited to the needs of each handicapped child [has been interpreted under section 794 of Title 29 as constituting] discrimination against the child and a failure to provide an appropriate, free public education for the handicapped child." *Doe v. Marshall,* 459 F.Supp. 1190, 1191 (S.D.Tex.1978).

Neither the Act nor the accompanying regulations set forth any specific guidelines defining in greater detail the program's substantive content. In formulating the IEP, however, the Act directs that "to the maximum extent appropriate, a handicapped child is to be educated together with non-handicapped children." 20 U.S.C. § 1412(5)(B) (1978); 34 C.F.R. § 300.-550(b)(1) (1981). *See also* 34 C.F.R. § 300.-550(b)(2) (1981); *S–1 v. Turlington, supra,* at 346. Thus, it would appear that a major emphasis of the Act is to mainstream handicapped children.

7. In discussing the objectives of the Act, the Senate Report states that "[w]ith proper education services, many [handicapped children] would be able to become productive citizens, contributing to society instead of being forced to remain burdens. Others, through such services, would increase their independence, thus reducing their dependence on society." S.Rep. No. 168, 94th Congress, 1st Sess. 2, *reprinted in* 1975 U.S.Code Cong. & Ad.News 1425, 1433. Accordingly, the Court concludes that an essential element of an appropriate education for a child as handicapped as Stacey is an opportunity to develop skills that would allow Stacey to be as self-sufficient as possible and to function outside of an institution.

8. The companion regulations to the Act provide that "to meet the needs of handicapped children," the state is to provide "a continuum of alternative placements", 34 C.F.R. § 300.551(a) (1981), from the least restrictive, e.g., instruction in regular classes, to more restrictive environments, e.g., special classes, special school, home instruction, and instruction in hospitals and institutions. *See* 34 C.F.R. § 300.551(b)(1) (1981). *See also S–1 v. Turlington, supra,* at 346. A placement is to be made to the "least restrictive environment" given the child's unique needs and the placement's "potential harmful effect". *See* 34 C.F.R. § 300.552(d) (1981). Of particular significance in the instant cause are the statutory directives that a placement be "as close as possible to the child's home" and "[u]nless the child's individualized education program requires some other arrangement," that the placement be made "in the school [the child] would attend if not handicapped..." 34 C.F.R. 300.552(a)(3) and (c) (1981). *See also*

ration of the services, and the justification for the provision of each service.

(E) A statement of the schedules and criteria for evaluating each short-term objective.

(F) Signatures of the committee members present and an indication of each member's consent or dissent with the decisions. Decisions must be supported by at least a majority of the required membership of the admission, review, and dismissal committee.

(G) For the pregnant student, the individual educational plan addresses any special provisions or modifications of the regular program needed as a result of the pregnancy and identifies the instruction and related services to be provided through special education.

(H) For the student in residential placement, the individual educational plan will specify the special education instruction time per student per day decided on an individual basis by the admission, review, and dismissal committee. The student's individual educational plan includes as necessary programming to be provided within the residential component in support of the approved educational program.

12. The IEP plays an important part in the placement decision of each handicapped child. In fact, a regulation accompanying The Act specifically requires that "[b]efore any action is taken with respect to the initial placement of a handicapped child in a special education program, a full and individual evaluation of the child's educational needs must be conducted in accordance with the requirements of § 300.-532." 34 C.F.R. § 300.531 (1981). *See also* Tex.Admin.Code tit. 19 § 89.214(b) (1981).

20 U.S.C. § 1412(5)(B) (1978); 34 C.F.R. § 300.302 (1981).

■ 9. Undeniably, Congress placed at a premium the laudable goal of maximizing the handicapped child's educational capabilities, including the attainment by the child of the highest level of self-sufficiency possible. Refer to Conclusion 6. The manner in which this goal is best accomplished given the educational needs of all the handicapped children is left primarily to the individual states. *See, e.g., Epperson v. Arkansas,* 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968) ("By and large, public education in our Nation is committed to the control of state and local authorities"); *Kruelle v. New Castle County School Dist., supra,* at 691; *Battle v. Commonwealth of Pennsylvania, supra,* at 276; *Gladys J. v. Pearland Indep. School Dist., supra,* at 875. While the Act intrudes somewhat into the state's traditional decision-making role in the education of handicapped children, it was not intended to supplant totally the state's prerogative in allocating its financial resources. It cannot be disputed that educational funding is limited. Accordingly, it necessarily follows that competing interests must be balanced to reach a reasonable and fair accommodation. On the one hand are the personal and unique needs of the individual and handicapped child; on the other hand are the realities of limited funding and the necessity of assisting in the education of all handicapped children. These competing interests must be considered by the Court in its analysis of what is a "free appropriate public education." Indeed, failure to consider these sometime conflicting interests would ultimately work to circumvent Congress' intent to educate all handicapped children as best as practicable. Excessive expenditures made to meet the needs of one handicapped child may reduce the resources that can be spent to meet the needs of the other handicapped children. As one commentator has stated:

> At the center of many complaints will be a conflict over the nature and quality of services to which a handicapped child is entitled. Parents will assert that the law requires certain services to be provided. The school representatives—aware of the constraints of their own budget—will contend that "appropriate" means something less.
>
> The language of the Act provides no clear guidelines for resolving such a conflict. Judges and hearing officers must develop standards for evaluating the facts of individual cases. It seems possible to suggest a few general propositions that might lend direction to their inquiry. To begin with, it seems clear that "appropriate" cannot mean the best possible education that a school could provide if given access to unlimited funds. At the same time, it undoubtedly means more than simply opening the doors of the regular classroom to those capable of entering and learning without special assistance. The Act surely contemplates a standard of appropriateness somewhere between these two extremes.

Note, *Enforcing the Right to An "Appropriate" Education: The Education for All Handicapped Children Act of 1975, supra,* at 1125; *Battle v. Commonwealth of Pennsylvania, supra,* at 278. The fact that Congress intended or at least was acutely aware of the need to strike a balance between the competing interests heretofore described is evidenced also by the requirement contained in the Act that the state establish "priorities for providing a free appropriate education for all handicapped children." 20 U.S.C. § 1412(3) (1978). *See also* 34 C.F.R. §§ 300.320–300.324 (1981). If Congress had intended the states to grant handicapped children the best possible education they could receive as though the states had unlimited resources, then there would have been no need to establish priorities.

■ Nevertheless, under the appropriate circumstances, local school districts must provide residential placement to the handicapped child. *Kruelle v. Biggs,* 489 F.Supp. 169, 173 (D.Del.1980), *aff'd sub nom., Kruelle v. New Castle County School Dist., supra; North v. District of Columbia Bd. of Educ.,* 471 F.Supp. 136, 139–40 (D.D.C.1979).

As stated by the court in *Gladys J. v. Pearland Indep. School Dist., supra,* at 875:

Federal regulations explicitly contemplate residential placement if such a program is necessary to provide special education and related services to a handicapped child, and, in this instance, state law implementing the EHCA mandates expressly provides for residential placement. Tex.Educ.Code Ann. § 16.104 (Vernon Supp.1980–1981). In short, little doubt remains that residential placement is part of 'specially designed instruction ... to meet the unique needs of a handicapped child' required by the EHCA.[13]

The regulations promulgated to enforce the Act contemplate also that residential placement may be necessary in order to provide an appropriate education.

If placement in a public or private residential program is necessary to provide special education and related services to a handicapped child, the program, including nonmedical care and room and board, must be at no cost to the parents of the child.

*Comment.* This requirement applies to placements which are made by public agencies for educational purposes, and includes placements in State-operated schools for the handicapped, such as a State school for the deaf or blind.

34 C.F.R. § 300.302 (1981). *See also* 45 C.F.R. § 84.34(c)(3) (1981); 20 U.S.C. §§ 1412(2)(B), 1413(a)(4)(B) (1978); Tex. Educ.Code Ann. § 16.104 (Vernon Supp. 1982). Obviously, when the circumstances of an individual case require that the handicapped child be provided a residential program, the Act's directives regarding mainstreaming, *see* Conclusions 6, 8, becomes secondary and should not preclude such a placement. *See Gladys J. v. Pearland Indep. School Dist., supra,* at 874 n.5 ("Mainstreaming is clearly a predominant thesis underlying the [Act]. The courts, however, have been quick to recognize that the overriding requirement of a free appropriate public education may preclude mainstreaming in certain areas"); *North v. District of Columbia Bd. of Educ., supra,* at 139. *See also* 34 C.F.R. § 300.552(d) (1981).[14]

10. In addition to a residential placement, a local education agency may be required to provide a summer school program to children in need of "special education". However, the definition of "special education" as found in 20 U.S.C. § 1401(16) (1978), *i.e.,* "specifically designed instruction ... to meet the needs of a handicapped child," necessarily implies that under the appropriate circumstances a special education might include a summer or year-round program. In *Armstrong v. Kline, supra,* the court found that children who are severely and profoundly impaired by mental retardation and severely emotionally disturbed children may require year-round education to prevent a serious loss of skills and development which would otherwise occur during a break in educational programming and could not be quickly recouped once educational programming was resumed. Accordingly, the Court concluded that an appropriate education within the meaning of the Act may include educational programming of longer duration than that routinely made available to non-handicapped children:

---

**13.** In an accompanying footnote, the Court stated further:

Residential placement is required when necessary for educational purposes. No obligation to provide residential placement arises where the placement is a response to medical, social, or emotional problems that are *segregable* from the learning process. *Kruelle v. New Castle County School District, supra.* The concept of education under the EHCA is necessarily broad, however, and the courts have held that residential placement is within the contemplation of the Act where the child's social, emotional, medical, and educational problems are so intertwined that it is impossible for a court to separate them. *Kruelle, supra; North v. Board of Education, supra,* at 139–40. The Court finds such to be the case here. *See also Tatro v. State of Texas, supra.*

*Gladys J. v. Pearland Indep. School Dist., supra,* at 875 n.8 (original emphasis).

**14.** Section 300.552(d) provides that "[i]n selecting the least restrictive environment, consideration is given to any potential harmful effect on the child or on the quality of services which he or she needs.

Equality of services and programs is not the test for determining whether an appropriate education is being provided by the state. The Act explicitly, in a number of instances, requires that the state provide services to handicapped children that it does not give to non-handicapped children, e.g., hospital and home instruction, see 20 U.S.C. § 1401(16), and also instructs, without mentioning the services provided to normal children that an educational plan be developed on an individual basis with attention paid to the handicapped child's needs. It is apparent that Congress recognized that "equal" services does not always provide handicapped children with an "appropriate education" and, thus by requiring defendants to meet the handicapped child's "unique needs", demanded that, in certain instances, more be provided.

Id. at 605. The Court finds the reasoning in Armstrong v. Kline, supra, to be persuasive and consistent with the intent of the Act. Hence, the Court concludes that a "free appropriate public education" may in certain instances include summer or year round educational programming.

■ 11. After careful and judicious consideration of the record and the arguments of counsel and their briefs in light of the relevant law, the Court concludes that an appropriate educational placement for Stacey at the present time is a highly structured educational program designed specifically to meet Stacey's particular and unique needs; Refer to Findings 38, 39. The specifics of such a program and the particular unique needs which such program is to address beyond the unique needs indicated by the Court should be developed in an IEP prepared for Stacey. In addition, because of the serious regression of academic skills and behavioral modification that Stacey will undoubtedly suffer if the structured educational program is not maintained continuously, Refer to Finding 46, P.I.S.D. is ordered to provide Stacey with educational programming on a twelve month, year-round basis.

12. The structured educational program referred to above can be provided to Stacey through a day-school program within the district while Stacey resides at home. In order to ensure that Stacey remains in a highly structured environment upon the termination of the school day when Stacey returns to her home, the Court orders the district to provide Stacey's parents with training in behavioral techniques for the management of Stacey's abnormal behaviors. In addition, the district is ordered to provide counseling to Stacey's parents in order to help relieve the emotional stress created by the burdensome demands and needs of a severely disabled child. Refer to Findings 38, 39.

13. In order to determine the specifics of the appropriate educational program for Stacey for the 1982–83 school year, P.I.S.D. is ordered by September 30, 1982, to convene a meeting of its Admission, Review and Dismissal Committee for the purpose of devising an IEP for Stacey that meets with Stacey's unique needs. This program will be developed in accordance with section 214 of Title 19 of the Texas Administrative Code, and will be based on a new comprehensive individual assessment of Stacey meeting the requirements of section 89.213 of Title 19 of the Texas Administrative Code. This comprehensive individual assessment of Stacey shall be performed prior to the preparation of the IEP referred to above and shall be prepared at the district's expense. The program shall be devised also with input from Stacey's parents. Because of the absence of the district's involvement with Stacey since 1979, Refer to Findings 26, 27, 43, the program will be formulated with input from the Autistic Treatment Center. In formulating the IEP for Stacey, the district and those involved with the development of the IEP should bear in mind that one of the aims of educational programming for Stacey is to achieve the highest level of self-sufficiency possible; the ultimate goal of education programming for Stacey is, of course, the complete avoidance of institutionalization. Refer to Conclusion 7.

14. As the district is unable at the present time to provide Stacey with the twelve month, year-round educational environment outlined above, Refer to Finding 45, the Court concludes that the only feasible option available is to maintain Stacey's current placement at the Autistic Treatment Center until September 30, 1982. Such placement should be maintained at P.I.S.D.'s expense.

15. In order to ensure a smooth transition from the Autistic Treatment Center to placement with P.I.S.D. and to ensure also that the transition does not have a serious negative effect on Stacey's current level of academic achievement and her emotional status, P.I.S.D. is ordered during the interim period to initiate greater involvement with Stacey, her parents, and the Autistic Treatment Center.

In the event the foregoing Findings of Fact also constitute Conclusions of Law, they are adopted as such. In the event the foregoing Conclusions of Law also constitute Findings of Fact, they are adopted as such.

Counsel for plaintiff is hereby directed to submit within five (5) days an appropriate Order incorporating by reference these Findings of Fact and Conclusions of Law.